LAMSON *v.* CITY OF MARSHALL.

1. ASSIGNMENT OF CLAIM—SECURITY—ACTION BY ASSIGNOR.
   The assignment of a claim as security does not prevent an action thereon in the name of the assignor with the knowledge and acquiescence of the assignee, the judgment being conclusive on the assignee.

2. SAME—CLAIM AGAINST CITY—PRESENTATION.
   Under a city charter forbidding suit against the city on a claim until after presentation thereof to the council, the presentation of a claim by one who has assigned it as security will support an action by him with the knowledge and acquiescence of the assignee.

3. MUNICIPAL CORPORATIONS — CONTRACTS — CONSTRUCTION OF SEWER—CERTIFICATE OF ENGINEER—RIGHT OF ACTION.

A contract for the construction of a sewer for a city provided for final payment on the work being completed in accordance with the contract, and to the satisfaction of the engineer, and on its being tested in such manner as should, in his opinion, be sufficient, and on a certificate being made by him showing the completion of the work. It also provided that no pipe should be laid in water; that water should not be allowed to run through the pipes during the construction, unless with the permission of the engineer; and that, in case of misunderstanding as to the meaning of the contract, the engineer's interpretation should be final. The sewer proved defective by reason of the pipes having been laid in water, in consequence of which the engineer refused a certificate. *Held*, that if such method of construction was directed, *and not merely permitted*, by the engineer, the contractor could maintain an action on the contract, though this method was favorable to him, and he knew that he could not thereby make a tight sewer, and though the contract further provided that, while the engineer might assent to special means of prosecuting work in difficult cases, this should not relieve the contractor of responsibility for the result, and that he should be liable for any defects in material or workmanship that might become apparent before final settlement. HOOKER, C. J., and MONTGOMERY, J., dissenting.

4. SAME.

Especially was this so where the city was advised of the facts during the progress of the work, and paid the monthly estimates without objection.

5. SAME—ESTOPPEL.

A city is not estopped to set up an insufficient performance of a sewer contract by the mere fact of its payment of periodical estimates without protest.

6. SAME—AUTHORITY OF ENGINEER.

General authority on the part of a city engineer to modify a sewer contract cannot be inferred from the fact that he is authorized to direct the manner of its performance.

7. SAME—CERTIFICATE OF ENGINEER—RIGHT OF ACTION—UNPAID CLAIMS.

Under a contract for the construction of a sewer for a city, providing for final payment on a certificate by the city engineer that the work has been completed and that all claims for labor and material have been satisfied, the ex-

istence of such claims when suit was begun by the contractor will not prevent a recovery, where the engineer, though knowing of the claims, said nothing about them in his notice that he would decline to accept the work until the sewer should be repaired, and the city was protected against liability for them by a sufficient bond, and they were in fact paid before the trial.

8. SAME—DELAY—STIPULATED DAMAGES.

A provision in a contract for the construction of a sewer for a city, under the head, "Penalty for Noncompletion of Work," that, if the work is not completed by the stipulated time, the contractor shall pay the city $10 a day while in default, as liquidated damages for the delay, and also the cost to the city of engineering, inspection, and superintendence during the default, is, as to the $10 a day, not a penalty, but a proper stipulation as to damages.

9. SAME—EXTENSION OF TIME BY COUNCIL.

There is not an extension of time by a city council, within a contract for the construction of a sewer for the city, providing for damages if the work be not completed at the stipulated time, or within such further time as may be allowed by the council, where, on petition for an extension, they merely adopt a report reciting that, while no advantage is desired, they believe it best to allow the matter to stand until final settlement, when all matters can be as readily settled as now.

10. SAME—WAIVER OF DAMAGES.

A provision in a contract for the construction of a sewer for a city, for payment to the city of damages of $10 a day for failure to complete it at the stipulated time, is not waived by permitting the contractor to complete it under the supervision of the city's engineer, and by receiving and paying estimates for the work.

11. SAME—ESTIMATE OF ENGINEER—CONCLUSIVENESS.

Under a contract for the construction of a city sewer, providing a higher price for rock excavation than for earth, and stating what shall be classified as earth and what as rock, payment to be made after the estimate of the city's engineer, whose interpretation of the contract is to be final, has been approved by the city council, his estimate is binding, if honestly made; and one attacking it has the burden of proving dishonesty.

12. SAME.

The contractor under such contract has no right to be present

at a conference between the engineer and his assistant to determine how to classify the material excavated.

13. SAME—FRAUD—EVIDENCE.

That a city engineer's estimate of the rock excavated by a contractor in constructing a sewer for the city was only 1,600 cubic yards, while there were 2,400 cubic yards, is not evidence of bad faith, destroying the binding effect of his estimate; but the fact that, when the contractor was entitled to his first estimate, the engineer declined to make one on the ground that "it might scare the city fathers," saying that he would "wait until we got scattered around on the outside trenches, and then they wouldn't know where we were, or what the estimate was for," in connection with the fact that rock was not anticipated, does justify an inference that the estimate was not the engineer's honest judgment.

Error to Calhoun; Smith, J. Submitted December 4, 1902. (Docket No. 48.) Decided May 29, 1903.

*Assumpsit* by Daniel A. Lamson and David Crowley, copartners as Lamson & Crowley, against the city of Marshall, to recover a balance due for the construction of a sewer. From a judgment for plaintiffs, defendant brings error. Reversed.

*John E. Foley* (*James M. Powers*, of counsel), for appellant.

*H. E. Winsor* (*Weadock & Purcell*, of counsel), for appellees.

CARPENTER, J. The plaintiffs recovered judgment in the court below for $4,241.75, an unpaid balance claimed to be due them for the construction of a sewer system for the defendant corporation. Defendant insists that the court below should have directed a verdict in its favor, because: *First*, before suit was commenced plaintiffs assigned their entire claim against defendant to the Commercial Savings Bank; *second*, plaintiffs never obtained a certificate showing the completion of the work and the satisfaction of all claims for labor and material, which, by

the contract, was a condition precedent to the right to maintain this action. Defendant also claims that the court below erred in not instructing the jury that it was entitled to stipulated damages for delay in construction, and in permitting plaintiffs to recover for 800 yards of rock excavation in excess of the allowance of the engineer. There are numerous other assignments of error, which will be sufficiently considered in discussing the foregoing assignments.

1. *Assignment to the Bank.* It appears that an assignment was executed by plaintiffs of "all moneys due and coming due" "for construction work on sewer" to the Commercial Savings Bank of Marshall. This was given to secure an indebtedness of $2,500, still unpaid at the time of the trial. Claim is made by the defendant that this assignment prevented a recovery in the name of the plaintiffs. Defendant contends that, though the plaintiffs presented this claim to the defendant's council, the failure of the Commercial Savings Bank also to present it affords a defense to the suit, because section 5 of chapter 17 of the charter of the city of Marshall forbids suits "against said city, on any account or claim, until the same shall have been presented to said council." We do not think this contention sound. It appears that the suit, though prosecuted in plaintiffs' name, was carried on with the knowledge and without the objection of the bank. The judgment in this case will, therefore, be conclusive upon the bank. The presentation of the claim by the plaintiffs complied with the charter provision above quoted.

2. Can this suit be maintained without the engineer's certificate that the contract was completed and the material and labor paid for ? On the completion of the work, in July, 1900, it was found that a section of the sewer, 1,080 feet in length, under Spruce street, which affected about one-third of the sewer system of the city, was defective. Because of this defect the engineer refused to give his certificate, and directed plaintiffs to relay this sewer. To relay it would have cost more than the balance claimed

due on the contract.   The contract contained this provision: .

"On all work provided for in this contract being completed in accordance with said contract, and to the satisfaction of the engineer, and on its being tested in such manner as shall, in the opinion of the engineer, be sufficient, and a certificate made by the engineer setting forth the amount of said work, and that said work has been completed, and that all claims for labor and material have been satisfied, the party of the first part agrees to pay to said parties of the second part the amount shown to be due to said second parties by said certificate of said engineer."

Plaintiffs contend that the defective condition of the sewer is due to a method of construction adopted by defendant's engineer, and therefore that, under decisions of this court hereinafter referred to, said engineer has no right to reject said sewer, or to withhold his certificate, because of its defective condition.  The evidence of the plaintiffs tended to prove that, late in the year 1899, they encountered a large body of running water while constructing the sewer in question; that this water came into the sewer in such quantities that it could be removed in no practicable way; that the engineer's assistant, in charge of the work, stopped the laying of the sewer until the engineer, who was at that time in Toledo, should determine what to do; that on his arrival the engineer directed said plaintiffs to put a roll of cement as well as a roll of oakum around the joints, and then to proceed to lay the pipes in the running water; that, acting under these orders, and under the immediate supervision of the engineer or his assistant, plaintiffs laid about 300 feet of said pipe; that in May, 1900, in this same sewer, they were troubled in a similar manner with water; that at that time, acting under the direction of the engineer, they obtained a steam pump, and lowered the water, though they did not entirely remove it, and by his orders again laid pipe in the sewer while water was running therein, in the same manner as that adopted in the preceding year; and that as fast as the pipe was laid they covered it up, as they were required by their

contract to do. The evidence tends strongly to prove that the defect in this sewer is due to the fact that the manner in which it was constructed did not exclude the water in which it was laid from entering the joints between the pipes. Defendant's testimony affirmed, and plaintiffs' denied, that the engineer consented to the method chosen on the condition that plaintiffs should make a sewer with absolutely tight joints.

In *Wildey* v. *School District*, 25 Mich., at page 424, Mr. Justice Cooley said:

"Whatever passed under his [the superintendent's] inspection as the work progressed, and was in good faith approved by him, expressly or by implication, was not open to objection on the part of the defendant afterwards, and, as to so much of the work, at least, the plaintiff had the same right to recover that he would have had if the proper certificate had been furnished him. For it could never be held to be the intention of the parties, by any such words are are contained in this contract, to give the superintendent power to re-examine his own conclusions after the builder had, as he supposed, completed the work, and then to refuse a certificate, and preclude the builder from recovering payment, except upon the condition of making changes and modifications in particulars which had his approval, or, being fully known to him then, were not objected to when the work was being done. An express agreement to give him this power would be so one-sided that it is not for a moment to be supposed the builder would enter into it. This contract contemplated the production of the certificate as the evidence of the contractor's right to his pay; but it might be waived, as it was in this case to the extent that payments were made; and the plaintiff was entitled to it as of right, as to any further work which he had done with the superintendent's approval, up to the 85 per cent. to be covered by the monthly estimates, and to the full amount, if the work was completed under his direction.

"If there were intentional departures from the contract, either as to materials or as to the mode of construction, with the approval or concurrence of the superintendent, a question might arise whether the contractor was entitled to greater or less compensation than if the contract had been strictly complied with; but this rec-

ord does not raise that question. Variances that may have been treated by both parties as immaterial at the time·should not afterwards be held to be departures from the contract, and what was then regarded as substantial compliance with its terms should be held a performance in law."

In the case of *Schliess* v. *City of Grand Rapids*, 131 Mich., at page 62 (90 N. W. 704), it was said:

"The law would not permit defendant to see this work go on, to ratify it day after day and week after week, to see plaintiff putting in stone not in exact accord with the contract, and then say, when the work is done, ' You have not complied with the contract.' Its time to accept or reject was when the work was being done. It could not lull the plaintiff into the belief that this work was satisfactory, and, when completed, reject it."

Defendant contends that the principles announced in the foregoing cases do not apply to this case, on account of the provisions of the contract under which the sewer was constructed, and on account of the circumstances attending the building of the defective sewer. The provisions of the contract touching this question are as follows:

Plaintiffs were to "excavate for building, and complete, good, firm, and substantial sewers, according to the map of route on file in the recorder's office, including sewer pipe, iron pipe, cement, suitable packing, house connections, manholes, lampholes, outlet masonry,   *   *   *   and all other material and appurtenances necessary to construct a proper and complete sewer, of the dimensions set forth in the schedule hereunto annexed, in the manner and under the conditions hereinafter specified."

"Sewer trenches must be kept clean and free from water by the use of a pump, pail, or sponge during the process of the work, as no pipe shall be laid in the water."

"All pipes must be kept thoroughly clean, and no water will be allowed to run through them during the construction of the sewer, unless with the permission of the engineer."

"Although the engineer may assent to special means of prosecuting work in difficult cases, this will not relieve the contractor of the responsibility of the result."

"The contractor shall have charge of and be responsible

for the entire length of sewers for whose construction he has contracted, until their completion and acceptance. He shall also be held liable for any defects which may appear in the material he has furnished, or in his work, before the final payments specified herein."

"Any tests which may appear to the engineer proper for ascertaining the condition of the pipes may be made use of, and the contractor will stand all damage caused by such tests. If any pipes are broken, or if cement in joints shall protrude sufficiently to form an obstruction to any test balls or other medium adopted by the engineer, the same shall be removed and made good by the contractor at his expense."

"If at any time after the acceptance of the work, and before the final five per cent. shall have been paid, any portion of the sewers, their appurtenances, or the surface of the street should require repairs by reason of faulty material or workmanship on the part of the contractor, the party of the first part shall notify the contractor, either in person or by mail, that such repairs are necessary, and defining the amount and nature of the work to be done. Should the contractor fail to cause such repairs to be made within ten days after such notice, the party of the first part shall have the right to purchase materials and employ men to execute the said repairs, and the cost of the same shall be deducted from the moneys due the contractor, or, from the insufficiency of said retained sums, shall be a charge upon the bond attached to this agreement."

"The work is to be done in accordance with the requirements of the plans, specifications, and contract, and in case of misunderstanding of the meaning of such plans, specifications, and contract, or any part of them, the engineer's interpretation shall be taken as final."

*Wildey* v. *School District* clearly holds that the engineer had sufficient authority to direct plaintiffs, if, in his judgment, the exigency demanded (and we are bound to assume it did), to disregard the provision that "no pipe shall be laid in the water." The plaintiffs had agreed to complete their work in accordance with the contract, and to the satisfaction of the engineer, and the engineer was made the judge of the meaning of the contract. The conclusion is unavoidable that the contractor performs his obligation when he does his work in the manner directed

by the engineer. It is not for him to determine what his obligations are, as, in any event, he is bound by the decision of the engineer.

It is insisted, however, that the provision, "Although the engineer may assent to special means of prosecuting work in difficult cases, this will not relieve the contractor of the responsibility of the result," imposes upon the plaintiffs in this case the responsibility for the result of the improper method of laying this sewer. In my judgment, this provision is not applicable to this case. If the plaintiffs are right in their claim (and whether they are right or not is a question for the jury), the engineer did more than assent to the means adopted in this case. He positively directed their adoption.

It is urged that it was a favor to the plaintiffs to be relieved from their obligation to remove the water before laying the sewer pipe, and that they actually knew that they could not, by the method adopted, make a tight sewer. Though this is true, the testimony nevertheless warrants the finding that the method by which this pipe was laid was selected by the engineer without any suggestion whatever from the plaintiffs, and that he directed its adoption with no understanding whatever that they were to be responsible in the event of its failure. The fact that the method of construction directed by the engineer was favorable to the plaintiffs, and known by them to be imperfect, might have great weight with the jury in determining the issue of fact raised by the conflicting testimony as to whether plaintiffs or defendant assumed the responsibility for the consequences resulting from the changed method of construction. But I know of no principle which permits the contractors to disobey orders of an engineer directing a variation from the contract because that variation is to their advantage, or because they believe that variation to be detrimental to the interests of the other party to the contract. The contractors are bound to obey the orders made in good faith by the engineer, whether those orders are advantageous or detrimental to their in-

terests; nor are they exempt from obedience because they believe those orders to be unwise.

The provisions in the contract making the contractor "liable for defects in the material he has furnished or in his work," and making him responsible for repairs "by reason of faulty material or workmanship," do not, in our judgment, apply to defective work performed at the express direction of the engineer. The engineer was, by the contract, made the final arbiter, and what he expressly directed as the work progressed was, as far as the contract was concerned, free from defects, and not faulty in workmanship.

There is also in the contract the provision heretofore quoted, providing for the payments after the sewer is "tested in such manner as shall, in the opinion of the engineer, be sufficient." The object of this test, manifestly, is to determine, not whether the methods adopted by the engineer were proper, but whether the plaintiffs have performed their work in accordance with their obligations. It is, in our judgment, repugnant to both equitable and legal principles to compel plaintiffs to again excavate and relay this sewer because the engineer selected an improper method of laying it.

Defendant argues that the plaintiffs' contention that the power rests in the engineer to change the method of performing the contract imposes upon it obligations never entered into by its common council. The same argument might have been urged in *Wildey* v. *School District* and *Schliess* v. *City of Grand Rapids*, *supra*. In our view, a municipality cannot avail itself of the advantage of having a supervising architect, with power to decide on every detail as it may arise, without taking the consequences of his making an erroneous decision. To hold that a municipality could not avail itself of the services of such a superintendent would be to shear it of a very proper and necessary power.

In the engineer's report to the defendant, January 20, 1900, we find the following:

"I would call your particular attention to article 8, paragraph 3, and to article 9, relative to flow of water. [These are the contract provisions heretofore quoted.] Had Mr. Lamson been compelled to keep the sewer dry by use of 'pump, pail, or sponge,' it would have ruined him. He has honestly endeavored, we believe, to build a perfect sewer; his methods, and his use of dry concrete, have enabled him to get good results; and, knowing that he was losing, your engineer did not enforce the pumping, although, in the opinion of the writer, it could have been done most of the time."

Information was thus conveyed to defendant's corporate organization of the method of laying sewer adopted by the plaintiffs, with the consent of the engineer. Defendant's failure to make any objection to this method, and its continuance to pay monthly estimates, would furnish evidence of its assent to the method adopted, if that assent is necessary.

It follows from the foregoing that, in our judgment, the jury were warranted in finding that the defective condition of the sewer was due solely to an improper method of construction lawfully ordered by the engineer in charge; and, if they did so find, plaintiffs were entitled to recover for this work, without the engineer's certificate, in accordance with the decisions of *Wildey* v. *School District* and *Schliess* v. *City of Grand Rapids, supra.*

The court, however, erred in instructing the jury:

"If you find they [the engineers] permitted the work specified in the contract to be performed in a manner different than that specified in the contract, they waived the conditions of the contract, and the plaintiffs are entitled to recover."

This language, as does the language in other parts of the charge, throws the responsibility upon defendant where the engineer has only assented to a departure from the contract. In such case the terms of the contract imposed on plaintiffs "the responsibility of the result."

Nor was it proper to charge the jury:

"The city could not permit the plaintiffs to perform this

work, put down sewer pipe, cover it up, pass it as satisfactory to them at the time, if they did so pass it, make estimates upon it, and pay them, and thereafter reject the same as unsatisfactory."

See *Boots* v. *Steinberg*, 100 Mich. 134 (58 N. W. 657).

Nor do we approve of portions of the charge from which the jury might have understood that the engineer and his assistants possessed general authority to modify the contract. They had no such general authority. They did possess, however, the power to direct plaintiffs in the performance of their work. Under our views, as expressed herein, plaintiffs were excused for deviating from the contract when, and only when, they acted under that direction.

It also appeared that, at the time this suit was instituted, the plaintiffs had not paid an account for sewer pipe of about $1,600, and a few other small accounts, amounting to less than $500. After plaintiffs claimed to have completed their contract, and just before this suit was commenced, they received a written notice from the engineer, stating that he would decline to accept their work until they repaired the sewer. Nothing was said in this notice about the claims under consideration, though their existence and condition were known to the engineer. Defendant was protected against liability for these claims by an indemnity bond, the sufficiency of which is not questioned, and they were paid just before the trial commenced in the court below. Under these circumstances we do not think that the existence of these claims at the time suit was commenced affords a defense. Plaintiffs were justified in acting upon the notice from the engineer, which told them, in effect, that they could obtain his certificate by rebuilding the sewer, and only in that way. According to that notice, the payment of the claims would in no way have aided them in obtaining the certificate.

3. *Stipulated Damages*. Plaintiffs claim their work was completed June 24, 1900. The contract contained this provision under the head, "Penalty for Noncompletion of Work:"

"It is hereby mutually understood and agreed that time, whenever mentioned in this contract, is the essence of this agreement; and the said parties of the second part still further agree that if said work is not completed on or before said date of completion [which is January 1, 1900], or within such further time as may be allowed by the city, through the common council, for such performance and completion, they shall and will pay the common council for the city of Marshall the sum of ten dollars for each and every day that the said parties of the second part shall be in default, as liquidated damages for said delay; and also that they shall and will, in addition thereto, pay to the said city the cost of engineering, inspection, and superintendence that the common council may have found it necessary to incur after the time fixed for the completion of the work aforesaid; all of which shall be determined by the engineer, and certified by him in writing."

The trial court instructed the jury to allow the cost of engineering, inspection, and superintendence occasioned by the failure to complete the contract January 1, 1900, and to disallow the amount of $10 per day stipulated damages. It is contended, in support of this ruling, that the $10 per day is not only named as a penalty, but is a penalty, inasmuch as the provision requiring the plaintiffs, in addition thereto, to pay the cost of engineering, inspection, and superintendence, covers all the actual damages caused the city. We cannot assent to this reasoning. The fact that the word "penalty" is used is not decisive. *Jaquith* v. *Hudson*, 5 Mich. 123. Neither is it true that the provision requiring the plaintiffs to pay the cost of engineering, inspection, and superintendence covers all actual damages. This does not include any compensation to the city for being deprived of the use of this sewer, which cost $28,000. Nor is it true that the interest on the cost of the sewer would compensate the city or its inhabitants for being deprived of its use. It was, under the authorities, a proper case for the stipulation of damages.

It is argued that "the common council extended the time in which to perform this work by leaving the matter open until the work was completed, as they stated, and by permitting the contractors to continue the work the fol-

lowing spring, sending their engineer to examine it, receiving the estimates upon the work, and making payment on the estimates." Just before the 1st of January, 1900, plaintiffs petitioned the common council for an extension of time for completing their contract until June 15th of the following year. On the 8th of January, 1900, the council adopted the report of a committee, which contained this language:

" While no advantage is desired to be taken of the contractors, we believe it best to allow the matter to stand without action until the final settlement of the contract, when all matters relating to the contract can be as readily settled as now, and that such action is better than to settle part of the matter now, and leave the rest until the future. We therefore recommend that the petition be laid on the table until the completion of the sewer under the contract."

This clearly was nothing more than a statement to the contractors that this question would be determined when their contract was completed. It certainly was not an extension of time.

Was the right to insist upon these stipulated damages waived by the city's permitting plaintiffs to proceed, under the supervision of its engineers, and by receiving and paying estimates for the work? This course is precisely what was contemplated by the contract when it was made, and by the council of the city when they declined to act upon the petition to extend the time. In other words, the contract provided, and the understanding contemplated, that, if the work was not performed by January 1, 1900, it should be performed later. We are unable to see how carrying out the contract according to its terms affords evidence of the waiver of those terms. In our judgment, therefore, plaintiffs must pay the stipulated damages under consideration.

4. *Rock Excavation.* The engineer estimated that plaintiffs excavated 1,594.6 cubic yards of rock. Plaintiffs claim that they excavated 2,400.8 cubic yards. The difference between the estimate of the plaintiffs and the

defendant is due largely to a difference in classification, plaintiffs insisting that certain material encountered in excavation should be classified as rock, which the engineer classified as earth. The contract price for rock excavation was $2 per cubic yard. It provided:

"All stones or boulders under eight cubic feet in volume will be classified as earth. * * * All boulders, ledge, or stratified rock having eight cubic feet in volume or over shall be paid for per cubic yard as rock. All shale which can be removed by pick or bar shall be classified as earth excavation. All shale requiring blasting for its removal shall be classified as rock. * * * The engineer shall, in all cases, decide whether blasting is necessary or not."

"In case of misunderstanding of the meaning of such plans, specifications, and contract, or any part of them, the engineer's interpretation shall be taken as final."

"All work to be paid for by the cubic yard * * * after the estimate of the engineer has been submitted to the common council in writing, and after the formal approval of such estimate by the common council."

Under the charge of the court the jury were permitted to disregard the estimate of the engineer, and to allow the plaintiffs' full claim for rock excavation, on the theory that the testimony warranted the inference that there was fraud or such gross mistake in the estimates as to make them of no binding force. Defendant insists that, under the evidence in this case, the jury should have been instructed that the estimates were final and conclusive. Plaintiffs' counsel claim that:

"The only accurate, honest measurement made of the rock was made by Mr. Lamson [plaintiff], with the assistance of his foreman; * * * that Mr. Riggs [the engineer] and Courtright [his assistant], in consultation in secret, * * * determined how they would classify the rock, and did not give the contractors any information as to what that classification was; and that they made computations of the rock excavated according to the profile that was made in Toledo by a draftsman who never saw the work, and was shown to be wrong."

It also appears that more rock was encountered than was anticipated by the engineer. It is affirmed by the

plaintiffs and denied by the engineer that about September 15, 1899, when they were entitled to their first estimate for excavating rock, the engineer said:

"If we got an estimate at this time, it would scare the city fathers so, as there was no rock figured on; and wait until we got scattered around on the outside trenches, and then they wouldn't know where we were, or what the estimate was for; and he put me off."

An estimate was made about a month later, but plaintiffs claimed it was insufficient. The last estimate of rock was made in January, 1900.

Does this evidence justify a disregard of the stipulations in the contract making the decision of the engineer final? In the case of *Chicago, etc., R. Co.* v. *Price*, 138 U. S. 185 (11 Sup. Ct. 290), the Supreme Court of the United States, speaking through Mr. Justice Harlan, said of stipulations of the character under consideration:

"We are to presume from the terms of the contract that both parties considered the possibility of disputes arising between them with reference to the execution of the contract, and it is to be presumed that in their minds was the possibility that the engineer might err in his determination of such matters. Consequently, to the end that the interests of neither party should be put in peril by disputes as to any of the matters covered by their agreement, or in reference to the quantity of the work to be done under it, or the compensation which the plaintiff might be entitled to demand, it was expressly stipulated that the engineer's determination should be final and conclusive. Neither party reserved the right to revise that determination for mere errors or mistakes upon his part. They chose to risk his estimates, and to rely upon their right, which the law presumes they did not intend to waive, to demand that the engineer should at all times, and in respect to every matter submitted to his determination, exercise an honest judgment, and commit no such mistakes as, under all the circumstances, would imply bad faith."

In harmony with this decision are the following cases: *Hanley* v. *Walker*, 79 Mich. 614 (45 N. W. 57, 8 L. R. A. 207); *Kihlberg* v. *United States*, 97 U. S. 398; *Sweeney* v. *United States*, 109 U. S. 618 (3 Sup. Ct. 344).

The rule deduced from these authorities, and the true rule, in our judgment, is this:   The estimate is binding if honestly made; it is not binding if it does not accord with the honest judgment of the engineer making it; and the burden to prove dishonesty is upon the party attacking the estimate.   These provisions would be nugatory if bad faith were inferred from mistakes in measurement, in computation, or in classification.   Nor can we agree with the trial court that, under the circumstances of this case, even a mistake of 800 yards afforded evidence of bad faith. This might have been due to an honest difference of classification.

We do not think plaintiffs had any right to be present at the conference between the engineer and his assistant when they determined how they would classify the material excavated by plaintiffs.   Plaintiffs were accorded their full rights if their complaints of improper measurement and classification were heard and honestly investigated and decided.   They had no more right to be present at the conference between the engineer and his assistant than has a litigant in court to be present when the judges or the jury confer on his case.

There is no merit in the complaint that the engineer computed the rock from a profile made by a draftsman in Toledo, who never saw the work.   The *data* from which the computation was made were approved by the engineer. The computation was made by him.   As well might it be said that he could not dictate his estimates to a stenographer, and sign them after they had been written on a typewriter.   The real question raised by this complaint, after all, is simply this (and it has already been sufficiently discussed):   Do mistakes in the computation of the engineer justify a disregard of his estimate?

But, in my judgment, the testimony of the plaintiffs that the engineer declined to make an estimate on the ground that "it might scare the city fathers," saying that he would "wait until we got scattered around on the outside trenches, and then they wouldn't know where we

were, or what the estimate was for," together with the fact that the rock was not anticipated, does justify an inference that the estimate made was not .the honest judgment of the engineer. This testimony, if believed, tended to prove that the engineer had a motive for giving plaintiffs an estimate for less rock than they excavated, and that he was dishonestly influenced by this motive to violate the duty he owed to the parties to this suit to make an honest estimate in September, 1899. Surely, the jury might infer that he continued to be influenced by this motive when he gave plaintiffs their estimates, if those estimates were, as plaintiffs' testimony indicates, altogether too small.

It is apparent from this opinion, however, that, in our judgment, the trial court erred in charging the jury:

"If, from the evidence, you find that the engineer in charge, or his assistants, did not make accurate measurements of the quantity of rock excavated by the plaintiffs, or did not make any measurement of it, or if there is so great a difference between the rock as measured by them and the amount you actually find from the evidence to have been excavated as not to be accounted for by an error of judgment, then the measurement of the rock so made by the engineer or his assistants is not binding upon the parties, and you are entitled to find the quantity of rock actually excavated from the evidence in the case."

Also in charging them that:

"If you find from the evidence that there is a difference between the amount of rock as given by the engineer or his assistants and the measurement as given by the plaintiffs of upwards of 800 cubic yards, this difference would be so great that it could not be accounted for except by mistake or fraud, and you would have a right to determine the quantity of rock actually excavated from all the evidence in the case."

For the reasons stated, the judgment must be reversed, and a new trial granted.

MOORE and GRANT, JJ., concurred with CARPENTER, J.

HOOKER, C. J.   I concur in the reversal of the judgment for the reasons given by my Brethren, and for further reasons.   The contract between the parties plainly implies that the plaintiffs should construct a good and tight sewer, so far as materials and labor will make it by following the methods of construction prescribed by the contract.   This is indicated by the provision for the testing of the pipes, and for repairs, and for liability for defects, found in general stipulations 8 and 10, and section 4 of the Duties and Powers of the Engineer, and the use for which the sewer was designed.   They are as follows:

"8. The contractor shall have charge of and be responsible for the entire length of sewers for whose construction he has contracted, until their completion and acceptance. He shall also be held liable for any defects which may appear in the material he has furnished, or in his work, before the final payments specified herein."

"10. Any tests which may appear to the engineer proper for ascertaining the condition of the pipes may be made use of, and the contractor will stand all damage caused by such tests.   If any pipes are broken, or if cement in joints shall protrude sufficiently to form an obstruction to any test balls or other medium adopted by the engineer, the same shall be removed and made good by the contractor at his expense."

"4. Although the engineer may assent to special means of prosecuting work in difficult cases, this will not relieve the contractor of the responsibility of the result."

"If at any time after the acceptance of the work, and before the final five per cent. shall have been paid, any portion of the sewers, their appurtenances, or the surface of the street should require repairs by reason of faulty material or workmanship on the part of the contractor, the party of the first part shall notify the contractor, either in person or by mail, that such repairs are necessary, and defining the amount and nature of the work to be done.   Should the contractor fail to cause such repairs to be made within ten days after such notice, the party of the first part shall have the right to purchase materials and employ men to execute the said repairs, and the cost of the same shall be deducted from the moneys due the contractor, or, from the insufficiency of said retained sums,

shall be a charge upon the bond attached to this agreement."

Section 3, art. 8, of the specifications provides:

" 3. Sewer trenches must be kept clean and free from water by the use of a pump, pail, or sponge during the process of the work, as no pipe shall be laid in the water."

Section 1, art. 9, provides:

" 1. All pipes must be kept thoroughly clean, and no water will be allowed to run through them during the construction of the sewer, unless with the permission of the engineer."

Section 3, art. 9, provides:

" 3. When the trench is left at night, or pipe laying stopped from any cause, the ends of the pipe must be closed by using a circular end-board closely fitting the socket end of the last pipe, said end-board to have a large number of small holes bored near the center, to prevent the trench filling with water, and to keep out sand and earth from the sewer; but in no case shall said board be inserted and water allowed to enter the sewer until the engineer·is satisfied that the cement of the joints in position is sufficiently set so as not to be injured by water coming in contact with it.

" This clause shall not prevent the engineer from ordering, but, upon the contrary, he may order, the end of the sewer closed absolutely tight whenever he determines that, in order to secure good results, the water should be excluded from the sewer. This shall apply to water entering the sewer or raising around the outside of the sewer. This right shall not be abridged or limited by any clause herein to the contrary."

In view of these various provisions, I am of the opinion that when the engineer consented to plaintiffs' laying the pipe in the water, in violation of section 3 of article 8, the city did not relieve the plaintiffs from the consequences of defective results by assuming the risk, even if it can be said that the engineer had authority to grant such privilege. The concession to lay the pipe in the water was made by the engineer (according to his testimony)

because of the great expense to-the-contractors of removing the water, and he testified that it was upon the condition that they would make an absolutely tight joint. It is evident that it was a favor, and it is not inferable that he or the city intended or were understood by the plaintiffs to consent to accept a defective sewer. The contractors must be presumed to have known that they could not make a tight sewer in that way, and in fact testified substantially to that effect. Moreover, the contract expressly provides that, "although the engineer may assent to special means of prosecuting work in difficult cases, this will not relieve the contractor of the responsibility of the result." The evidence shows this to have been intended for a sanitary sewer, which plaintiffs knew must be tight to be of value, for they so testified.

Again, the provision that "no water will be allowed to run through them [*i. e.*, the pipes] during the construction of the sewer, unless with the permission of the engineer," which is relied on to support the claim that by so consenting the city waived the express provision that the pipe must not be laid in water, is susceptible of another construction, especially when read in connection with section 3 of the same article (9):

"3. When the trench is left at night, or pipe laying stopped from any cause, the ends of the pipe must be closed by using a circular end-board closely fitting the socket end of the last pipe, said end-board to have a large number of small holes bored near the center, to prevent the trench filling with water, and to keep out sand and earth from the sewer; but in no case shall said board be inserted and water allowed to enter the sewer until the engineer is satisfied that the cement of the joints in position is sufficiently set so as not to be injured by water coming in contact with it.

"This clause shall not prevent the engineer from ordering, but, upon the contrary, he may order, the end of the sewer closed absolutely tight whenever he determines that, in order to secure good results, the water should be excluded from the sewer. This shall apply to water entering the sewer or raising around the outside of the sewer.

This right shall not be abridged or limited by any clause herein to the contrary."

The consequences appear to be very serious, setting the water back in the defective sewer and laterals for a long distance. In my opinion, there is nothing in this record that should estop the city from claiming its contract rights. See *Boots* v. *Steinberg*, 100 Mich. 134 (58 N. W. 657). It follows that, not only was there no waiver of the right to a tight sewer by the act of the engineer, but he was justified in not giving the certificate provided for by the contract.

The judgment should be reversed, and a new trial ordered.

MONTGOMERY, J., concurred with HOOKER, C. J.