ALGATE *v.* CITY OF LANSING.

1. APPEAL AND ERROR—TRIAL—DIRECTED VERDICT—EVIDENCE.
   On error to review a directed verdict, the testimony of the defeated party must be taken as true and considered in the view most favorable to him.

2. CONTRACTS—BREACH—EVIDENCE—MUNICIPAL CORPORATIONS.
   Evidence in an action against a municipal corporation for breach of a sewer contract that plaintiff was unable to get sufficient brick of the kind specified by the city engineer, who was charged with the duty of inspection, and that plaintiff substituted a kind of brick which was more expensive and conformed to the requirements of the contract, but the engineer rejected the work in which such material was employed and refused to give an estimate such as the contract provided for on work thereafter done in a proper manner by the contractor, *held*, to present a question for the jury whether the defendant had violated the agreement.

3. SAME—ARBITRATION—INSPECTION—MUNICIPAL CORPORATIONS.
   A provision in a contract for the construction of a city sewer that all materials should be furnished by the contractor and approved by the city engineer before being used, did not make the decision of the engineer final and conclusive: nor was a further contract proviso that all work should be done in a neat, substantial, and workmanlike manner, "to the satisfaction of the common council, under the direction of the engineer whose orders are to be obeyed in all matters pertaining to workmanship or materials subject to these specifications," sufficient to vest in the city officials authority to finally pass upon work and materials used.[1]

4. SAME.
   And whether or not the decision of the engineer was fair and reasonable so as to bind the parties, plaintiff was entitled to have an estimate on work which was not ques-

[1] The question of the conclusiveness as between municipality and contractor of decision of engineer or other empowered officer as to matters concerning contract for public improvement is treated in a note in 23 L. R. A. (N. S.) 317.

tioned and which he had done after the rejection of the
substituted brick: failure to furnish such estimate con-
stituted an actionable breach of a contract that provided
that estimates for partial payments should be made upon
request of the contractor presented prior to Saturday of
any week.

5. SAME—CONTRACTS—SATISFACTION.
   The contract was not of the class known as satisfaction
   contracts, in which the taste or judgment of one of the
   parties is made the sole basis of acceptance or rejection,
   but if the work which was done by the contractor con-
   formed in a reasonably sufficient manner to the require-
   ments of the contract it was a complete performance and
   he was entitled to an estimate.

Error to Ingham; Wiest, J. Submitted October 13,
1914. (Docket No. 28.) Decided June 1, 1914.

Assumpsit by John H. Algate against the city of
Lansing for breach of a contract for construction of
a sewer. Judgment for defendant on a verdict di-
rected by the court. Plaintiff brings error. Re-
versed.

*Seymour H. Person,* for appellant.

*Joseph H. Dunnebacke (C. P. Black,* of counsel),
for appellee.

STEERE, J. Plaintiff, by a writ of error, seeks re-
view and asks reversal of a judgment on a directed
verdict rendered against him in the circuit court of
Ingham county in an action brought upon a written
contract entered into between him and defendant
whereby he engaged to construct a sewer system for
a portion of the city of Lansing according to certain
plans and specifications made a part of said contract.

The system, involving an expenditure of near
$40,000, contemplated an egg-shaped, trunk sewer
built of brick and concrete, 72 inches from top to bot-

tom at the lower end, and gradually growing smaller as it receded from its outlet, with several laterals of tile extending from the main sewer in different directions.

The contract, following a form approved and adopted by the common council of the city of Lansing on October 11, 1909, is an elaborate document covering 20 pages of the printed record, very full and complete as to all matters involved in the undertaking, with specifications divided and subdivided under headings as to method of construction, workmanship, material, and other details relating to different branches of the work and the rights, duties, and responsibilities of the parties. It was executed May 9, 1910, requiring the work to be commenced June 1, 1910, and completed not later than November 30, 1911. Further reference will be made to such portions of this contract as become material to questions which it is necessary to pass upon or consider.

Performance of the contract was entered upon, and the work progressed, under plaintiff's general control, but in direct charge of his son and other foremen; he being absent portions of the time looking after other contracts he had taken until July 10, 1911, when plaintiff took personal charge. About August 5th the city engineer, who was inspector by the terms of the contract, made objection to the manner in which certain work was done, and especially forbade the use of some red sand brick, in the trunk sewer, which was from the same brickyard but varied in color from that previously used. Just at that time the brickmakers were unable to furnish the light colored sand brick which had been previously used, and plaintiff, claiming that the red was just as good or better, more expensive, and fully complied with the specifications of the contract, continued its use for a time, until the other brick could be again furnished, building about 32 feet of the sewer with it.

On August 10, 1911, the engineer sent plaintiff a written communication stating that on August 5th notice had been given him not to lay the red brick, and later to discontinue laying certain inverted stone in an unworkmanlike manner, with notice that no estimate would be given him for work done until the same was replaced according to specifications. This notice was received while plaintiff was unable to get the light brick, and he continued to use the red for a time thereafter, until authorized by the engineer to use a certain mud brick which the brickyard was able to furnish, when he continued with the latter, joining them to the red brick which he did not replace. During the time he was laying the mud brick the city engineer and chairman of the sewer committee were many times at the sewer and observed what was being done. The culminating and chief cause of friction between the parties appears to be plaintiff's refusal to replace the red brick with others. On August 18th plaintiff made written application to the engineer for an estimate claimed due him under the contract, with which to obtain a partial payment "on work done on said sewer, and not previously estimated by you," which was refused. Plaintiff continued the work for a time, until after the next meeting of the city council, and, being unable to secure an estimate or payment, withdrew his tools and men and discontinued work on September 1st, claiming defendant had violated the contract in not paying him the percentage due on work done according to the contract, and that he was unable to continue through lack of funds resulting from the city refusing to pay him money then due. On September 11th he received a communication of defendant, from the common council, inclosing a copy of a resolution directing him to proceed with his contract at once, or his bond for its faithful performance would be forfeited and he held responsible for all resulting damages. He sought legal advice, and on

September 14th his attorney wrote the city engineer, stating the facts as plaintiff claimed them, and concluding:

"Kindly advise me, as Mr. Algate's attorney, if you will now make these estimates and when. Also whether you do withdraw your objections as stated in said letter, or still insist on same. Also if you insist on work being replaced as stated in said letter.

"Mr. Algate is entitled to the information that he may know how to proceed and is entitled to his money, in order to continue to finance the work."

On September 17th he sent to the city council copies of the correspondence and resolution accompanied by the following letter:

"LANSING, MICH., Sept. 17, 1911.
"HON. COMMON COUNCIL,
        "City of Lansing.
"Gentlemen:
"Annexed you will please find copy of a letter to City Engineer Sparks; also copy of letter from said City Engineer Sparks to John Algate; also resolutions of common council to John Algate.

"Kindly advise us as to attitude of city in reference to matters mentioned in said letters. Your early advice will be kindly appreciated."

This communication was received and placed on file, but not answered. On August 23, 1912, this action was begun.

By the opposing claims of these litigants, as set forth in their elaborate pleadings, each charges the other with numerous violations of their contract in many detailed particulars.

The theory of plaintiff's declaration is a hostile attitude towards him manifested in the inspection of the work, which was unjust, captious, oppressive, and in effect fraudulent, in that proper material was repeatedly rejected, and the work objected to when being properly carried on in strict compliance with the contract; that the inspector hampered and interfered

with the progress of the work by abusive and profane language and brutal conduct towards plaintiff's employees to an extent which rendered it difficult to keep men on the job, and captiously ordered work which complied with the contract to be changed and done again, refusing estimates and payments for work done, and not objected to, until such orders were obeyed, and by such refusal deprived plaintiff of the necessary means to continue.

The theory and claim of defendant, as indicated by its special notice under a plea of the general issue and lengthy cross-examination of plaintiff's witnesses, is that plaintiff persisted in slighting the requirements of his contract by faulty construction and inferior material, in defiance or evasion of the inspector, repeatedly violating the terms of his contract, and finally, when compliance was insisted upon, abandoned it.

Most of these conflicting claims presented by the pleadings involve issues of fact and call for but incidental consideration as the case is now presented by this bill of exceptions on a directed verdict, for in this inquiry plaintiff's testimony must be taken as true, and considered in the light most favorable to him.

On the trial of the case defendant offered no evidence, but moved the court for a directed verdict in its favor at the conclusion of plaintiff's testimony, for the following reasons:

"(1) Under the undisputed evidence in this case it appears that the plaintiff, on September 1, 1911, abandoned all work upon the contract which he had entered into with the defendant to construct the sewer in question, alleging for his reason therefor that the city engineer had refused to make and furnish to him an estimate of work done and material furnished, up to and including August 18, 1911, and not previously estimated, which estimate under the undisputed evi-

dence in this case he was not then entitled to demand and receive.

"(2) For the reason that the plaintiff admits in his testimony that the city engineer had rejected certain brick which plaintiff was using in the construction of said sewer and notified the plaintiff not to use them in such work, and that he, the plaintiff, disregarded such directions of the city engineer and did use such brick in such work after he was so notified by the city engineer not to use them, and that it was for the work thus done with such rejected brick that he claims he was entitled to such estimate from said city engineer.

"(3) Because there is no evidence in this case from which any inference can be drawn that the act of the city engineer in rejecting the brick in question and notifying the plaintiff not to use them was not the exercise of his honest judgment.

"(4) Because the plaintiff did not, before he abandoned work upon said sewer, bring to the notice of the common council of the city of Lansing his reasons for such abandonment."

This motion was granted on the ground, as indicated in the reasons stated when directing a verdict, that the contract made the engineer an arbiter, and his decision on questions arising under it was final and conclusive, unless he acted fraudulently, and in bad faith, of which there was no competent proof; that the engineer had a right to and did reject the brick, and "it was his duty not to give plaintiff an estimate upon the city to pay for something he had rejected;" that plaintiff's own testimony showed he first violated the contract, abandoned the same, and did not fully perform it, and therefore could not recover upon it.

In leading up to these conclusions, the court stated plaintiff's rights in case of defendant's default in payments as follows:

"If he was entitled to an estimate, and without reason it was refused him, then he was justified in abandoning his contract, because one who performs

work for another upon an agreement that from time to time as he has performed part of it he shall have his pay is entitled to his pay, and, if he does not get it when he is entitled to have it, then he need not proceed with further performance of the contract. But if he demands an estimate, and because he does not get it he abandons the contract and later on brings suit on the contract, he must come prepared to show that he was justified in abandoning it; the justification being that he was entitled to his estimate, and it was refused him."

The contract provided upon the subject of partial payments as the work progressed:

"Estimates for partial payments will be made by the engineer, upon a request of the contractor, if made prior to Saturday of any week; twenty-five per cent. will be retained therefrom until completion of the work."

Under this provision of the contract, plaintiff had received from the engineer 15 different estimates as the work progressed. While he complains these were made on a wrong basis, too small, and unfair to him, because they were based on a prorating of the percentage over the entire cost or contract price of the system, and not on the relative value of the work actually done, he states that he submitted to it so long as he was financially able to continue the work, as under the contract he would have just that much more coming to him when the contract was completed, but that, when he asked for the estimate, a refusal of which compelled him to cease operations, not only were his previous estimates too small under the contract, but from three to four weeks' work had been done since his last estimate, during which time he had built a receiving chamber and 250 feet of the trunk sewer, only 32 feet of which contained the red brick objected to, and there was due him for such work, most of which was not objected to, about $2,000.

While plaintiff has numerous complaints of unfair

treatment, in violation of the contract, his ultimate grievance which culminated in his ceasing work is, not that he was unjustly forbidden to use brick which fully complied with the specifications, for he testified that he did not stop work for such reason, but that defendant breached the contract by the refusal of an estimate and payment to which he was entitled and so crippled him financially that he did not have the requisite funds and could not continue. His own testimony confines him to this as the test question in the case and we think defendant is equally limited to such issue by its motion for a directed verdict based on plaintiff's undisputed evidence.

Irrespective of their previous differences, work in performance of the contract progressed, and payments were made from time to time on the engineer's estimates, with no indication that either party contemplated terminating it because of a breach by the other until the difficulty arose over the use of the red brick, and then the work continued for a time, and more of the sewer was constructed with brick approved by the engineer. Plaintiff thereafter was apparently doing the work in a manner and with material satisfactory to the inspector and proposed to continue if he could secure the payment he claimed was due him. He quit because unsuccessful in that particular, and defendant demanded in writing that he should continue.

The question on this record, therefore, is whether plaintiff, by his evidence, has *prima facie* established his right to discontinue work and bring this action for breach of contract, for the reason that defendant's inspector refused to give him an estimate, and defendant refused him a payment to which he was entitled.

No question is raised as to tile laterals to be constructed under the contract. Of the large, egg-shaped trunk sewer plaintiff constructed about 3,000 feet,

and the break between the parties arose over the use of the forbidden red brick in 32 feet of this construction. All the brick used was furnished by Clippert & Spaulding, a local firm of brickmakers. They manufactured both a white and red sand brick and a cheaper clay or mud brick. Their white sand brick had been in use for construction of sewers in Lansing for about 12 years, and was mostly used on this contract. At the time plaintiff used the red sand brick Clippert & Spaulding were unable to furnish the white. Plaintiff claims, and testified, that the red brick complied fully with the specifications, were equally good and more expensive than the white, costing from $1 to $2 a thousand more, that the cheaper mud brick, which the engineer later authorized him to use, were laid in the sewer, and connected to the red, so as to form one continuous construction, in the presence of the engineer.

The specifications in the contract relative to brick were as follows:

"All brick used in the work must be sound, hard, and thoroughly burned through, clean and free from lime. None but whole brick are to be used except by permission of the engineer. All brick must be thoroughly soaked in water before being used. All brick which break under this test must be rejected. If required by the engineer, the contractor must provide a suitable tank in which to soak the brick for a period of twelve hours. All brick must be well wet immediately before being used in dry, hot weather."

It is plaintiff's testimony that the red brick as laid fully complied with all these requirements. George Clippert, who had been engaged in manufacturing brick for over 40 years, and was a member of the firm which made these, testified that the red brick fully complied with the specifications in every particular; that they were as good as the white for sewer purposes; that the clay for their manufacture came from the same bed; that they were mixed the same, put

through the same machines, and burned in the same kilns, but some burned red and some white, the latter predominating; that the red, on account of their more attractive color, were more desirable for facing brick, and brought a better price; that they were otherwise practically the same and equally durable as the white. Of the reason for delivering plaintiff the red brick, he says:

"Why, I ran out of the white ones, and I had some of them red ones on hand, and I delivered them, even though these brick were more expensive than the others; that was nothing to me. I would not stop my work on account of the brick, not when I had any brick of any kind."

Spaulding, the other member of the firm, testifying to the same effect, said:

"The reason why they are called sand brick is you have to mix them with sand to make them, for if we do not they would crack, if they are not strong. We have some clay that burns red and some that burns white. We have to mix the sand with both of them; other than the color they are the same brick, only the difference in the color. The clay with the white are made out of magnesia, and the red has more iron substance in it."

The written notice given plaintiff by the engineer to replace the red brick, in default of which an estimate would be refused, required that he replace the same "according to the specifications for the construction of said sewer," thus directly referring his demand to such specifications, and implying that in his judgment they did not comply therewith. This necessarily raised a question of fact, unless the decision of the engineer was final and conclusive. The court held that under the terms of the contract it was, unless plaintiff showed the inspector acted dishonestly and in bad faith, saying:

"Under this contract he could not use any material unless it was approved by the engineer or the inspec-

tor. I do not understand, however, that that would require the engineer to be there and pass upon each particular item of material going into the work. If the engineer was about and made no objection to material that was visible and being used, then it could be treated as approved. But when the engineer told the plaintiff that he must not use the red sand brick, then the red sand brick had not only not had his approval but his express rejection, and it was the duty of the plaintiff to immediately cease using them, because he had contracted that he would not use material except as it had been approved by the engineer."

The then charter of defendant provided that the city engineer should "have the supervision and charge of the construction and repair of all sewers and drains whenever and wherever ordered by the common council." In harmony with this provision the form of contract for sewer work previously adopted by the common council and used in this case designated him as inspector to have charge of and supervise the contemplated construction. As its official and employee he was defendant's agent and representative in protecting its interests and seeing that the work was performed in compliance with the contract. This, however, would not preclude the contracting parties from agreeing that he should also be the arbitrator between them and his decision final in any matter in difference. If they did so agree, his determination would be conclusive and binding between them, to the exclusion of any appeal to the courts, unless he acted in bad faith and fraudulently.

On the subject of inspection this contract provides that:

"Whenever the word 'inspector' is used in these specifications it is understood to refer to the city engineer or, in his absence, such special inspector as may be appointed by the council or engineer for the purpose of supervising the work."

A special inspector was appointed by the engineer

and inspected the work under his supervision. The most stringent provisions in the contract as to inspection, and those upon which defendant relies, are:

"All materials of whatever nature required in the work are to be furnished by the contractor, and must be approved by the engineer before being used, and the contractor must furnish full facilities for such tests as may be required.  *  *  *

"All work to be done in a neat, substantial, and workmanlike manner, to the satisfaction of the common council, under the direction of the engineer, whose orders are to be obeyed in all matters pertaining to workmanship or materials, subject to these specifications."

The contract nowhere provides in exact words that the engineer or inspector shall be an arbitrator, or that his decision shall be final, in the clear and concise language commonly found in contracts construed as appointing an arbitrator. It is well settled that the contracting parties may agree to the arbitrament of even an interested party, if they see fit, and when they do so with full knowledge they must abide the result, in the absence of fraud; but there must be no room to doubt that such was the intention of the parties. The agreement must be express, not implied. *Central Trust Co.* v. *Railway Co.* (C. C.), 70 Fed. 282; *Mercantile Trust Co.* v. *Hensey,* 205 U. S. 298 (27 Sup. Ct. 535, 10 Am. & Eng. Ann. Cas. 572). In *Lamson* v. *City of Marshall,* 133 Mich. 250 (95 N. W. 78), relied upon in this case as authority for directing a verdict, the contract under consideration provided:

"In case of misunderstanding of the meaning of such plans, specifications, and contract, or any of them, the engineer's interpretation shall be taken as final."

Equally clear and conclusive language appears in the contracts construed in *Hanley* v. *Walker,* 79 Mich. 607 (45 N. W. 57, 8 L. R. A. 207); *Guthat* v. *Gow,*

95 Mich. 527 (55 N. W. 442) ; *Moran* v. *Schmitt,* 109 Mich. 282 (67 N. W. 323) ; *Kelley* v. *Public Schools of Muskegon,* 110 Mich. 529 (68 N. W. 282).

While this contract confers upon defendant and its engineer strong controlling authority over the construction during its progress, in the particulars that material furnished by the contractor must be approved by the engineer before being used, and the work must be done to the satisfaction of the common council, under direction of the engineer, whose orders are to be obeyed, the requirements of the contract are yet made the final test by the provision that such matters are "subject to these specifications." This is emphasized in behalf of defendant by the further provision that:

"Any direction in relation to the work that may be given by said inspector in contravention to the provisions of the plans or specifications shall in no wise be binding upon the city."

While the work is required to be to the satisfaction of the common council, this is not of that class of satisfaction contracts involving the personal sentiment, taste, or sensibility of the party to be satisfied, in which case his expression of satisfaction or dissatisfaction cannot be questioned, but involves, as in *Schliess* v. *City of Grand Rapids,* 131 Mich. 52 (90 N. W. 700), "gross considerations of operative fitness and mechanical utility which are capable of being seen and appreciated by others," where compliance with the requirements of the contract is held to import satisfaction.

The proposition is urged in behalf of defendant that:

"It makes no difference in what capacity the city engineer acted, whether as an arbitrator between the parties, or as a supervising agent for the city; the agreement was that the brick should, before being

used, be passed upon by the city engineer and approved by him. It would be unreasonable to suppose that the contractor had the right to furnish such brick as he saw fit to use, place it in the sewer against the objection of the city engineer, go forward with the work and construct a large sewer and cover it up, and then try out the question as to whether the brick were good and complied with the specifications in a lawsuit afterwards, when it would be impossible to determine from examination whether such was the case."

As a general proposition this contention, as stated, presents a reasonable rule of construction, but applied to the facts of this case, disclosed by the thus far undisputed testimony, it becomes of less force.

It is plaintiff's claim that the brick in dispute not only complied with all specifications of the contract, but that in effect they had been passed upon and approved by the engineer, inasmuch as they were shown by the testimony to be of the same quality, from the same clay bed, made by the same parties, in the same manner, and with the same machines as that previously approved and used in the construction; the only difference being the color, in relation to which the contract contained no requirement. Plaintiff's testimony also showed that it was yet possible to determine from examination whether they were good and complied with the specifications, there being no difficulty in traversing the interior of this large, egg-shaped sewer and making a thorough inspection and comparison of all its parts, and that this had been done, with an acetylene lamp, prior to the trial; that most of the red brick which he was directed to replace had been laid before the engineer ordered him not to use them; and that after such order, and before the clay brick he was authorized to use came, he had laid only from 500 to 700 red brick, and then under the engineer's orders proceeded with the clay brick.

Plaintiff's evidence also shows that the value of the work done subsequent to the last estimate, exclusive

of the red brick ordered replaced, amounted to approximately $1,600, and that to replace the red brick would cost about $200.

It is admitted by plaintiff that he laid some red brick after the engineer told him not to do so, and that he did not remove those he had laid when ordered to do so. On the strength of these admissions a verdict was directed for defendant under the theory that the decision of the inspector was conclusive, and in disregarding it plaintiff breached the contract.

There is no language of finality in the contract which in our view makes the decision of the inspector an arbitrator between the parties to the extent that his decision is binding and conclusive to the exclusion of an appeal to the courts for an adjudication of whether the material furnished by plaintiff in truth complied with the specifications. For the time being, while the work was in progress, the engineer was vested with authority to judge, direct, and reject, to compel faithful performance, and, as suggested by the trial court, to refuse an estimate upon the city to pay for something he had rejected. While he had rejected this 32 feet of red brick sewer, he had not rejected the other $1,600 worth of work done since the last estimate. The notice he gave plaintiff stated, "No estimate for work done will be given you until same is replaced according to specifications for the construction of said sewer." What portion of the work done was not in accordance with specifications or in what particular is not stated. It does appear that no answer was given to inquiries upon the subject, and all estimates were cut off, but the work ordered continued.

It also appears that both parties thereafter recognized the contract as in force, and construction of the sewer was continued by plaintiff beyond the red brick, over which the difference had arisen, under direction and inspection of the engineer, with work and ma-

terial to which no objection was made; operations only being suspended when lack of funds, owing to refusal of estimates for work performed, rendered continuance impossible. Under the contract 25 per cent. was retained on all work until its final completion and acceptance by the council, and plaintiff's bond for faithful performance required him "to keep the whole work in perfect repair for a period of twelve months from its acceptance by the council as completed."

In the case of *Montgomery* v. *Mayor*, 151 N. Y. 249 (45 N. E. 550), under a contract for construction of a sewer providing for the appointment of an inspector by the park commissioners to see that the material furnished corresponded with the plans and specifications, whose certificate approved by the engineer was a condition precedent to payment, the court said, as can be said here, that the effect of the contract was to vest in the inspector a right or capacity to pass upon the performance of the work "which came very near to constituting him, as between the parties, the judge as to that matter," and further said:

"For all that the case discloses, there was nothing to prevent the plaintiffs going on with the work and relying upon their ability to prove, if upon completion the city should refuse to make payment, that the work and materials were up to the requirements of their contract."

In *Gearty* v. *Mayor*, 171 N. Y. 61 (63 N. E. 804), under a contract and contentions analogous in many respects to the instant case, touching the rights of the parties and the course to be pursued, the court said:

"We thus have a situation where each party charges the other with breach of the contract. The city insists that the work was improperly done, and the contractor urges that the commissioners are arbitrarily or improperly exercising the powers vested in them by the contract. Questions of fact and law are thus presented, which can only be determined by a trial.

"It is very clear that the plaintiff could have stopped work as ordered by the engineer of construction and stood upon his contention that the work had been properly done, brought his action to recover for labor and materials performed and furnished under the contract, and claimed his prospective profits. *Smith* v. *Wetmore*, 167 N. Y. 234 [60 N. E. 419]; *Roehm* v. *Horst*, 178 U. S. 1 [20 Sup. Ct. 780]. * * * The fact that this work was to be performed to the satisfaction of the commissioners and their engineer of construction is not conclusive against the plaintiff. That power cannot be exercised in an arbitrary manner, but reasonably and in accordance with fairness and good faith.

"This court has frequently held that under such a provision, that which the law will say a contracting party ought in reason to be satisfied with, that it will say he is satisfied with."

Many of plaintiff's assignments of error relate to adverse rulings on the admission of testimony offered, made upon the theory that the inspector was a final arbitrator whose decisions were conclusive and could not be questioned. In view of what has already been said, we think those questions, as now presented, are not likely to arise on a retrial of the case, and therefore need not be reviewed in detail.

We conclude, from the copious record before us, that this is a case which, on a full trial, inevitably involves, not only interesting questions of law, but numerous and serious issues of fact for a jury, that plaintiff's evidence *prima facie* established his right to an estimate, at least for some amount, on work which had not been questioned, and therefore his right, on refusal of payment, to bring this action for breach of contract; therefore defendant's motion, at the conclusion of plaintiff's testimony, for a directed verdict in its favor, should have been denied.

The judgment is reversed, and a new trial granted.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.