[Sac. No. 1519.   In Bank.—March 31, 1909.]

# CITY STREET IMPROVEMENT COMPANY, Appellant, v. CITY OF MARYSVILLE, Respondent.

MUNICIPAL CORPORATIONS—CONTRACT FOR SEWER—WORK SUBJECT TO APPROVAL AND ACCEPTANCE OF ENGINEER—ESTOPPEL OF CITY.— Where a contract with a municipality for the construction of a sewer system provided that the work should be done under the constant immediate supervision and direction of the engineer for the city in charge of the work and his subordinates, and inspected and rejected or approved as it progressed and before the trenches were refilled with earth, the city, in the absence of any fraud on the part of the contractor, operating to prevent a discovery of any imperfection in the manner of doing the work, and after the work had been inspected, approved, and accepted by its engineers in charge, is estopped from claiming that the work was not done in accordance with the contract, when the alleged defects were such as to have been discoverable by reasonable attention to the duties of inspection.

ID.—EFFECT OF ACCEPTANCE BY ENGINEER.—To allow the acceptance by the engineer and his subordinates thus to operate as an estoppel on the city would not be to allow them to vary the terms of the contract to the detriment of the city. The effect of such acceptance, so far as alleged defects were concerned, was merely to finally determine whether the work was in accord with the contract.

ID.—PLEADING ACTS CONSTITUTING ESTOPPEL—PERFORMANCE OF WORK. —In an action by the contractor to recover the amount due by the city under such contract, the plaintiff, in order to avail itself of the estoppel of the city arising from the acts of its engineers in accepting and approving the work done, was not obliged to specially plead the facts constituting the estoppel. Under section 457 of the Code of Civil Procedure, an allegation of performance of the work under the contract was sufficient to admit evidence of such acceptance and approval.

APPEAL from a judgment of the Superior Court of Yuba County and from an order refusing a new trial. Eugene P. McDaniel, Judge.

The facts are stated in the opinion of the court.

Bishop, Wheeler & Hoefler, William Rix, and Richard Belcher, for Appellant.

W. H. Carlin, Arthur H. Redington, Waldo S. Johnson, and E. B. Stanwood, for Respondent.

THE COURT.—This action was brought to recover the sum of $4,000.07, the balance alleged to be due plaintiff from defendant for labor done and materials furnished in the construction of a portion of a sewer system for the city, under a written contract, a portion of the demand being for extra work. The total contract price, including extra work amounting to $2,940.16, was $33,731.29, of which defendant had paid plaintiff $29,731.22. Defendant claimed that plaintiff had not performed and had refused to perform the contract according to its terms, and on this ground resisted payment of the alleged balance, and, by counterclaim sought to recover the amount alleged to be necessary to complete the work. The trial court sustained this contention of defendant, finding that defendant had already necessarily expended $10,452.69 in completing certain portions of the work according to the contract, and would be required to expend the further sum of $21,525 to fully complete the same, making in all $31,977.69 so to be expended by the city in completing the work. It, therefore, gave judgment in favor of defendant against plaintiff for the difference between said $31,977.69 and the balance due on the contract, $4,000.07, viz.— $27,977.62. From this judgment and from an order denying its motion for a new trial the plaintiff appeals.

The sewer system contemplated was to consist of sewers laid in the city, a receiving reservoir or sump, an outfall sewer extending from the sump to and beyond the corporate limits of the city, a pumping plant to pump the sewage from the sump to the place of outfall, an irrigation farm on which to discharge the sewage, and flush-tanks. The undertaking of plaintiff was to furnish all the labor and material necessary to construct all of the work on such sewage system as was specified in "division A" of the specifications, in strict compliance with the specifications therefor, which were attached to and

made a part of the contract. The work specified in that division was the furnishing and laying of some forty-two thousand feet 'of sewer pipe (8-inch, 10-inch, 12-inch and 15-inch), at a specified price per lineal foot according to the size of pipe, and the furnishing of materials and labor in constructing 29 flush-tanks, 109 manholes and 1 overflow, at a specified price for each. Much of the sewer pipe was to be laid several feet below the water level, and it was important that it should be laid so as to prevent, so far as practicable, leakage or seepage from the ground into the pipe. The specifications provided for the best quality of vitrified, salt-glazed, ironstone pipe, which, so far as appears, was in fact used. They further provided that the contractor shall pump out, or otherwise remove any water or sewage which may be found or may tend to accumulate in the trench, "and the trench is to be kept entirely clear of water until all the mortar is set." They also provided that special care must be taken to properly fill with cement mortar, the annular space at the bottom and sides as well as the top of the joints, a neat finish to be given to the joints, by a further application of similar mortar to the face of the hub, so as to form a continuous and even-beveled surface from the exterior of said hub to the exterior of the spigot all around. Other provisions as to the manner of laying need not be mentioned, as they are not material here.

The work was to be done, according to the contract, "in obedience to such directions as may from time to time be given by the engineer in charge appointed by the said city of Marysville or his authorized agent or agents." It was provided in the specifications that after the sewers and their appurtenances "have been properly constructed and inspected," clay or fine earth shall be carefully deposited in the trench so as not to disturb the work, and the trench then refilled—that in case of doubt as to the correct interpretation of the specifications, the matter may be submitted to the engineer in charge, whose decision shall be final—that all materials for work must be satisfactory to the engineer in charge, "and all work, and the order and methods of work, will be under the direction and must be to the satisfaction of the engineer in charge"—that the representatives of the engineer in charge are to be given all desired facilities for the inspection of materials and proc-

esses used or to be used in connection with the work—that all rejected material is to be removed from the work at once—that any workman or tools that shall not meet the approval of the engineer in charge shall be ordered from the work at the request of said engineer, and such workmen and tools as shall meet the approval of such engineer in charge must be immediately substituted. They further provided: "Progress payments will be made upon the estimates of the value of work done during each month to the extent of seventy-five (75) per cent of the work done during such month. These payments will be made by warrants on the city treasurer, as provided by law. The estimates to be made by the engineer in charge. Final payment, including deferred payments, will be made in the same manner upon the completion of the work to the satisfaction and approval of the engineer in charge."

Plaintiff commenced work under the contract in September, 1903, and proceeded steadily therewith, making the necessary excavations, laying the pipe and doing the other work, and refilling the trenches, until April, 1904, when the work was apparently supposed by all parties to be completed. Mr. Marsden Manson was the engineer in charge, and had furnished the specifications. He was assisted by Mr. Edward F. Haas, his associate. The work was done under the more immediate supervision of a superintendent for the city, employed by the city at the suggestion of Mr. Manson, one Cyrus Dam, who had under him four inspectors appointed by the city, there being at all times an inspector for the city supervising each gang of plaintiff's men employed on the work. There was also an engineer employed by the city at the suggestion of Manson to give the lines and grades, one H. G. Butler. No complaint was made as to the manner of work or kind of materials during the progress of the work except in one or two instances, where the matter was at once remedied, and the work progressed to completion to the apparent satisfaction and approval of everybody engaged in supervising the work.

Each month a progress estimate was furnished by the engineer to the common council, certifying the amount and value of the work done up to the first day of the month, with a statement of the amount due the plaintiff. These were similar in form, that of December 4, 1903, which may be taken as a sample, being as follows:—

"San Francisco, Cal. Dec. 4, 1903.

To the Mayor and Common Council of the City of Marys-
ville.

Gentlemen: This is to certify that the following work has
been done up to December 1, 1903, by the various contractors
for sewer work now under construction in the city of Marys-
ville, and that an estimate of the reasonable value of said
work, in accordance with the various contracts is as follows:—

City Street Improvement Co.

(Here follows itemized statement of number of feet of pipe
laid and other work.)

| | |
|---|---|
| Total .......................... | $13,603.57 |
| Less 25 per cent. .................. | 3,400.89 |

| | |
|---|---|
| 75 per cent. of total................ | $10,202.68 |
| Amount due on main contract | |
| (7399.28 having already been paid) | 2,803.40 |
| Extra work ordered and completed... | 58.75 |

| | |
|---|---|
| Total amount due ............... | $2,862.15 |

Respectfully submitted,

Edw. F. Haas,

Associate Engineer.

Approved:

Marsden Manson."

On receipt of each of these certificates the amount stated there-
in to be due was paid to plaintiff.

On March 31, 1904, a certificate signed by Mr. Haas and
approved by Mr. Manson was presented to the common council,
which covered all the work done by plaintiff. It stated that all
the work specified therein, valued at $32,064.29, had been done,
that seventy-five per cent of the total thereof was $24,798.22 of
which $22,951.46 had been paid, and that there was due on the
main contract $1,846.76. It further stated that extras ordered
and completed were of the value of $630, of which $225.50 had
been paid, leaving $404.50 due. Mr. Manson was present at
this meeting, and orally reported that the work was practically
completed, all in fact except three joints of pipe and one man-
hole which were not laid and completed by reason of the re-
quest of the city to defer the work, and that he thought the

plaintiff might be safely paid all but about one thousand dollars of the amount. Thereupon, the city paid the amount certified as due; together with $4,266 of the twenty-five per cent deferred payments, leaving $4,007 unpaid. The unfinished work was completed within a few days thereafter.

Almost immediately thereafter, the sewers having been connected, the engineer and his associate caused a test to be made to ascertain the amount of leakage of water into the pipes laid by plaintiff. It was found that from the whole system there was flowing through the main pipe leading to the sump one thousand one hundred gallons of water a minute, which reached that point and could only reach it by reason of leakage into the sewer pipe laid by plaintiff. This flow was three fourths of the carrying capacity of the pipe. The test was also made by districts, and it was found that the leakage into the pipes was not confined to any particular section, but existed all over that portion of the system laid under the water level. It had been estimated by the engineers that with the sewer laid in strict accord with the plans and specifications, the total flow from leakage would be approximately only forty-five gallons a minute, and their testimony, with that of Mr. Connick, sufficiently supported the conclusion that such would have been the case. The test made it evident that somebody had blundered. Mr. Manson thereupon on April 23, 1904, notified the common council that the seepage was far in excess of any reasonable amount, and that it would be necessary radically to correct the work before any use could be made of the sewer system. He stated that it was not possible to determine the exact cause of this without a critical examination of the joints, but that from what had been brought to his notice, he was satisfied that most of it was due, either to the washing out of the mortar before it had had time to set, or to the fact that the joints were not adequately filled with mortar. Three sections were specified as especially defective, and it was recommended that these sections, an aggregate of thirteen blocks, be uncovered, and the leakage remedied. The common council notified plaintiff in writing of this recommendation, and directed it to proceed to comply therewith. Plaintiff claimed it had completed its contract and did nothing. A subsequent general notice to complete its contract was ordered on May 13, 1904, and was sent to the president and secretary of plaintiff

by registered mail. The common council thereupon advertised
for bids for doing said work of uncovering, cleaning, and re-
mortaring the joints and refilling the trenches on the thirteen
blocks and received no bids, whereupon they resolved that the
city should do the work. They proceeded with such work by
day labor under superintendents for the city, and at the time
of the trial had expended $10,452.69 in doing such work on
some of the blocks specified, as well as on other blocks not
specified. The evidence was sufficient to support the conclusion
that for the work done the amount expended was not unreason-
able. The evidence is also sufficient to support the conclusion
that the pipes and the cement thereon were not materially dis-
turbed by the work of uncovering. After the first portion of
the work had been uncovered, which was where the most leak-
age had been apparent, and the pipes and joints washed off, a
careful inspection thereof was made, and it was found that on
by far the greater portion of the joints there was either no
cement at all on the lower half, or there were holes therein,
while the cement on the upper half was all right. The same
thing appeared in the other sections of pipe subsequently un-
covered by the city for the purpose of repair. There was
evidence sufficient to support the conclusion that the work of
repairing these joints was substantially in accord with the
original specifications, and where this work has been done, the
leakage has been so far reduced as to come within the original
estimate of the engineers. The inference is irresistible
that the trouble was due to a failure on the part of the em-
ployees of the contractor to conform to the specifications,
either in failing to properly apply the cement on the lower
half of the joints, or in failing to keep the trenches free from
water during the laying of the pipe and until the cement
mortar was set. The latter was apparently the principal cause.
The testimony shows that owing to heavy rains and the ordi-
nary seepage of water in the ground, it was an exceedingly
difficult matter to keep the trenches free of water, but that it
was possible. Plaintiff used a pump for this purpose, and
when in operation this pump ordinarily sufficed. When the
work of repair was done it was found possible by the em-
ployees of the city to keep the water away from the joints
for the requisite time. There was much testimony as to the
original work which showed a constant and reckless disregard

by plaintiff's employees of the requirement as to water in the trenches, and that this was so was practically demonstrated by the condition in which the joints were found on being uncovered. Not only was there much evidence to show that much of the pipe was laid by the employees when there was water in the trenches to such an extent that the lower portions of the pipe and joints were in the water, but it also appeared that it was of frequent occurrence for the pump to break down or for the man operating it to stop work during the night, with the result that water would rise in the trenches and reach the newly laid pipe, much of which had been partially covered with earth. As we have said, the condition of the work when uncovered was such as to practically demonstrate that there had been almost uniform disregard by plaintiff's employees of this important provision of the specifications. Mr. Manson and his associate Mr. Haas, saw the work only occasionally, and had no knowledge of any failure on the part of the contractor in regard to this matter, no information being given them by the contractor or by any person engaged in superintending or inspecting the work.

The estimate as to necessary future work is based upon the fact of excessive leakage still apparent in various sections, where the old work has not as yet been uncovered, and the cost thereof estimated by experts who calculated in the light of the knowledge afforded by the cost of the work already done.

The trial court held that plaintiff did not perform, and has not performed, all or any of the terms or conditions of its contract on its part provided to be done and performed—"that among other material matters in which it failed and neglected to perform the contract, it did not lay and cement the joints of the pipe therein referred to, according to said contract and specifications."

It is contended by plaintiff that these findings are unsupported by the evidence, and this contention presents the real question in the case. For the purpose of considering it, we have made a statement of the evidence that we deem material.

It is earnestly contended that the city is estopped to deny the completion of the work by reason of its failure to object as the work progressed, and by reason of the signing of certificates by the engineer from month to month and upon the supposed completion of the work, evidencing his approval thereof. Con-

tracts of the kind here considered are not new to the law. The stipulation in such contracts that the engineers' estimate should be final has been held valid and binding by the courts of England, by those of the various states of the Union and by the federal tribunals. The superior court of Missouri has this to say of such stipulations: "By such a stipulation, the parties constitute the engineer an arbitrator, and the provision is held, if anything, more binding than an ordinary submission, for the reason that it enters into and becomes a part of the consideration of the contract, without which it would not, in all probability, have been made.

"It has its origin in contracts for the building of important and extensive government works, and was designed to avoid harassing litigation over questions that can only be determined honestly by those possessed of scientific knowledge." (*Williams* v. *Chicago etc. Ry. Co.,* 112 Mo. 487, [34 Am. St. Rep. 403, 20 S. W. 631].)

It would be difficult to find a case where the contract more clearly contemplated that the work of plaintiff should be done under the *constant immediate supervision and direction of the engineer* in charge and his subordinates, and inspected and rejected or approved as it progressed and before the trenches were refilled with earth. This, we think, is amply evident from the contract itself, which includes the specifications and was certainly the practical construction given it by the parties throughout. As we have seen, the work was all done under the supervision of the subordinates appointed by the city at the engineer's request, and who were his representatives upon the ground, and were there for no other purpose than to see that the materials furnished and the work done by plaintiff's employees were in all respects as required by the contract, and to require compliance with the contract as the work progressed, whenever any departure therefrom was observed. The defects now alleged in regard to the work,—viz. that water was allowed to be in the trenches to such an extent as to injure the cement before it had set, and the failure on the part of workmen properly to apply the cement to the lower half of many of the joints, were matters which, assuming that they did occur, should have been observed by the engineer, through his representatives, at the time the work was being done, and when they could have easily been remedied. No portion of the work could

be properly covered with earth until it had been inspected and found in proper shape, and there is no pretense that any of it was so covered prior to such inspection as was desired or requested by the inspectors. When it was allowed to be so covered, there was a practical approval and acceptance of the work by the engineer, through his representatives, and this acceptance was affirmed and approved from month to month by his own certificates to the common council of the city, stating the amount of work done by plaintiff to the first of the current month and the amount due therefor. These certificates necessarily implied that the work so certified was done according to the specifications and to his approval. The final certificate showed all the agreed work to be done, necessarily to the approval and satisfaction of the engineer, and this certificate was reinforced by the oral statement of the engineer to the same effect, made to the council at the meeting at which it was received, except that it appeared from such oral statement that a few joints of pipe and a manhole certified completed had not been completed because of a request of the city that they should be deferred for a few days. Under these circumstances, we think that the city is clearly estopped to urge that plaintiff has not performed its contract.

Authorities upon this point are not wanting. It must be borne in mind that we are speaking of a case where there was no fraud on the part of the contractor, operating to prevent a discovery of any imperfection, for there was not the slightest basis in the evidence for a conclusion to that effect. The most that could be contended is that there was evidence tending to show lack of care on the part of certain employees of plaintiff to comply fully at all times with the specifications in doing the work, and such a lack of care as should have been observed and remedied before the work was finally covered. In the case of *Schliess* v. *City of Grand Rapids,* 131 Mich. 52, [90 N. W. 700], the supreme court of Michigan said: "The conduct of the defendant, through its inspector and architect and board of public works, estops it from now claiming that the contract was not fulfilled. Its authorized agents were there during the entire progress of the work, charged with the duty to see that it was properly done. The city, through its board of public works, acted weekly on the reports made, and paid the amounts due for the estimates. The law would not permit defendant to see

this work go on, to ratify it day after day, and week by week, to see plaintiff putting in stone not in exact accord with the contract, and then say, when the work is done, 'you have not complied with the contract.' Its time to accept or reject was when the work was being done. It could not lull the plaintiff into the belief that the work was satisfactory, and, when completed, reject it."

In *Wildey* v. *Fractional School District*, 25 Mich. 419, the work was to be done under the direction of the architect and to his entire satisfaction, and an overseer was to supervise the work for the district. The court said: "Whatever passed under his (the owner's) inspection as the work progressed, and was, in good faith, approved by him, expressly or by implication, was not open to objection on the part of the defendant afterward."

In *Laycock* v. *Moon*, 97 Wis. 59, [72 N. W. 372], the action was for the balance alleged to be due for the stone and brick work of a barn, and the defense was that the work had not been fully performed, in that the walls had not been slushed or pointed with mortar, and improper stones had been used. The contract provided that the plaintiff should make a complete and workmanlike job to the entire satisfaction of the proprietor and architect, the whole of the work to be inspected as it went on. It was held that the defendant and his architect were bound to make inspection of the work and materials as the work progressed, that the contract implied that the work and materials were to be accepted or rejected at the time of inspection, and during the progress of the work, and that as the alleged defects were obvious to the stipulated inspection, they could not avail defendant after the completion of the work.

In *Ashland etc. Cement Co.* v. *Shores,* 105 Wis. 122, [81 N. W. 136], where the contract provided that a building should be constructed according to certain plans and specifications, to the satisfaction of the architect, "who shall inspect all material and work as the building is constructed" and who was invested with power to reject any material or work not deemed by him to be in compliance with the contract, it was held that the manifest intent was that unsatisfactory material or construction should be promptly rejected, that the architect should not by silence allow unsatisfactory construction to proceed to a point where its removal from the building would be attended

with serious loss to the builder, and that a failure to reject seasonably operated as a waiver.

(See, also, *Beswick* v. *Platt,* 140 Pa. 28, [21 Atl. 306] ; *Board of Commissioners* v. *O'Connor,* 137 Ind. 622, [35 N. E. 1006, 1012, 37 N. E. 16] ; *Laycock* v. *Parker,* 103 Wis. 161, [79 N. W. 330, 331] ; *Potomac Steamboat Co.* v. *Harlan etc. Co.,* 66 Md. 42, [4 Atl. 903] ; *Lamson* v. *City of Marshall,* 133 Mich. 250, [95 N. W. 78] ; *Standard etc. Co.* v. *Hemminghaus,* 157 Mo. 23, [57 S. W. 746].)

In *Ashland etc. Co.* v. *Shores,* 105 Wis. 122, [81 N. W. 136], this rule was declared to state a reasonable and just doctrine in cases of this nature. The court, through Marshall, J., said that where the owner stipulated for inspection and approval as the building is constructed, and for a representative of his own to compel compliance with the contract at every step, if such representative failed to perform his duty the loss should fall on the owner, and not be shifted to the builder who may have been lured into the belief that his work and material were satisfactory till too late to remedy defects therein without serious loss, that the owner should look to his architects, that he should be and is bound the same as if he were upon the ground himself, charged with the duty of accepting or rejecting material or construction as soon as there is a reasonable opportunity for the inspection of it. It was said that this is but an application of the elementary principle, that where property is delivered by one person to another, as fulfilling an executory contract between them requiring such delivery, and the latter neglects to notify the former that the property is not accepted as complying with the contract within a reasonable time after a fair opportunity to inspect it, an acceptance will be inferred, and that "any considerable delay in that regard must operate, by all equitable considerations, as an acceptance, except as to defects not discoverable by reasonable attention to the duties of inspection."

There is no basis in the record for the conclusion that the alleged defects were such as were not discoverable by reasonable attention to the duties of inspection. So far as the water being at times in the trenches before the mortar had time to set is concerned, that fact and the resultant damage, if any, to the cement were as discoverable by a reasonable inspection prior to the filling in of the trenches as they ever could be. The same is

true as to any carelessness of the workmen employed in putting cement on the lower portion of the joints.

It is urged that to allow the acceptance by the engineer and his subordinates thus to operate as an estoppel on the city would be to allow them to vary plain and unambiguous terms of the contract between plaintiff and defendant to the detriment of defendant. But, as was said in *Standard Stamping Co.* v. *Hemminghaus,* 157 Mo. 23, [57 S. W. 746], where a similar contract was made, it was entirely competent for the city, through its engineer and his subordinates, to determine that the sewer as laid in the open trench and ready to be covered with earth was just what the contract required. Having seen it and having had the fullest opportunity of inspecting it, all of those defects which were visible, or could have been ascertained by a reasonable inspection, were waived. In other words, the question whether the work was in accord with the contract was thus finally determined so far as such defects were concerned, in the absence of bad faith or fraud on the part of the contractor. The contractor could not be held responsible for any mere negligence or mistake on the part of the city's agent in the matter of such inspection.

The cases cited by learned counsel for defendant on this point, other than *Lamson* v. *City of Marshall,* 133 Mich. 250, [95 N. W. 78], and *Burke* v. *Kansas City,* 34 Mo. App. 570, do not appear applicable under the facts of this case. *Lamson* v. *City of Marshall,* 133 Mich. 250, [95 N. W. 78], has already been cited herein as supporting the views we have stated. If there is anything in *Burke* v. *Kansas City,* 34 Mo. App. 570, a decision of the court of appeal for Kansas City, in conflict with that view, it must be disregarded in view of the later decision of the supreme court of Missouri in *Standard Stamping Co.* v. *Hemminghaus,* 157 Mo. 23, [57 S. W. 746]. The case of *Schmidt* v. *North Yakima,* 12 Wash. 121, [40 Pac. 790], a case much relied on by counsel, was one where the evidence showed that the contractor deliberately planned to escape the responsibilities of his contract by furnishing inferior materials and inferior workmen to place the materials on the ground, and tried over and over to secretly work in rejected material, to such an extent that the city refused to allow him to finish the work and the engineer refused to give any certificate as to the work done. It was held that he had

been guilty of such fraud, that he could not recover in any form of action.

As we have said there was nothing here to indicate any lack of good faith on the part of the contractor, or the slightest indisposition to conform to any direction of the engineer and his subordinates—nothing to serve as a basis for the conclusion that there was any fraud. Nor was there anything to indicate any effort by it or any of its employees to hamper or restrict the engineer or any of his subordinates in the matter of inspection.

Respondent's counsel contend that the plaintiff should not be permitted to show anything indicating an estoppel, because the certificates of the engineer were not set forth either in substance or otherwise in the complaint. We do not think it was necessary to plead the certificates specially. Section 457 of the Code of Civil Procedure is as follows: "In pleading the performance of conditions precedent in a contract, it is not necessary to state the facts showing such performance, but it may be stated generally that the party duly performed all the conditions on his part, and if such allegations be controverted, the party pleading must establish, on the trial, the facts showing such performance." The complaint did plead the contract in terms. Under that contract, one of the conditions precedent to demand by and payment to plaintiff of progress and final installments of the contract price was the approval of the engineer. Under the statute just quoted, this condition precedent was not necessarily the subject of a special plea. The ultimate fact to be alleged was the performance of the work under the contract. The certificates, although, in the absence of fraud, conclusive as to that fact, are nevertheless but evidence of it.

There are no other alleged errors requiring special notice.

The judgment is reversed and the cause remanded for new trial in accordance with the suggestions set forth above.

ANGELLOTTI, J., dissenting.—I dissent. It is not possible under the evidence to escape the conclusion that the plaintiff did not substantially perform the terms of its contract. The evidence shows an almost uniform and utter disregard by plaintiff's employees of one or the other of two plain and unambiguous provisions of the contract, absolutely

essential to protection against excessive leakage of sewer pipe laid below the water-level, and inserted for the purpose of such protection, the result being that the work, as turned over to defendant, could not have served the purpose for which it was intended.

So far as the claim that the certificates of the engineer constituted an estoppel is concerned, the question presented is a simple one. It may be assumed, as was held by the trial court and the district court of appeal, that the engineer was by the terms of the contract made the arbiter whose decision upon the question of performance should bind the respective parties. But it is recognized by all the authorities, and is admitted by learned counsel for plaintiff, that such a decision is conclusive only in the absence of a showing of fraud, collusion, or mistake of fact. Where it is shown that the decision was obtained through fraud, collusion, or such mistake of fact as is ground for relief in equity, the effect of the approval is overcome. (3 Page on Contracts, sec. 1469.) The trial court was amply warranted in concluding that Mr. Manson had given these certificates in absolute ignorance of the manner in which the work certified had been done, a matter as to which plaintiff must be held to have had full knowledge, and upon the assumption, warranted under the circumstances, that plaintiff had in doing it complied with these all-important provisions in the specifications.

As to the claim that the city is estopped from denying that the work was performed in accordance with the contract by reason of the fact that it was done under the supervision of a superintendent, an assistant engineer to give the lines and grades, and inspectors, all appointed by it for the purpose, who failed to make objection thereto, and allowed plaintiff by their silence to believe that it was satisfactory until it was too late to remedy it except at great expense: There is a line of authorities holding that where it is the evident intention of the contract that the work shall be inspected as it progresses, and unsatisfactory material or labor rejected at once, and the owner has a representative on the ground to oversee the work as it is done and to guard against defective material or labor, defects which were observed by the owner's representative, or which would have been discovered by him by reasonable inspection, are waived by the owner, in the absence of fraud on

the part of the contractor. (See *Schliess* v. *Grand Rapids,*
131 Mich. 52, [90 N. W. 700]; *Wildey* v. *Fractional School
District,* 25 Mich. 419; *Laycock* v. *Moon,* 97 Wis. 59, [72 N. W.
372]; *Ashland etc. Co.* v. *Shores,* 105 Wis. 122, [81 N. W. 136].
It has been said that it is a reasonable and just doctrine that
in such cases the loss should fall on the owner, and not be
shifted to the builder who may have been lured into the belief
that his work and material were satisfactory until too late to
remedy defects therein without serious loss, and that any con-
siderable delay in manifesting disapproval will operate, by
equitable considerations, as an acceptance, except as to defects
not discoverable by reasonable attention to the duties of in-
spection. (*Ashland etc. Co.* v. *Shores,* 105 Wis. 122, [81 N. W.
136].) The rule is, of course, based entirely on equitable con-
siderations, and we have not found any case where it has been
applied to such a substantial departure by the contractor from
plain and unambiguous terms of his contract, as is found to
exist here, a departure which must be held to have been know-
ingly made, and which, as the contractor must have known,
would necessarily have the effect of materially impairing the
efficacy of the new sewer system of which its work was an es-
sential and important part. In the case at bar, it was, of
course, the duty of the superintendent and inspectors em-
ployed by the city, to notice such failure to comply with the
specifications on the part of thè contractor as were obvious, or
could be ascertained by the exercise of reasonable care on their
part, and to require such compliance, or at least to bring the
matter to the attention of the engineer, Mr. Manson. But if
through ignorance or carelessness they failed to perform their
duty in this regard, plaintiff would not be warranted in as-
suming from their silence that the city was willing to waive a
plain requirement so important to the success of the work.
It knew that the inspectors were there simply for the purpose
of requiring conformity on its part to the terms of the con-
tract, and were without authority to waive any material pro-
visions thereof; it knew that it was essential to the protection
of the pipe against excessive leakage that the cement mortar
put on the joints should be protected against water until it
had time to set, and it knew that for this purpose the contract
imposed upon it the obligation of keeping the trenches entirely
clear of water until the mortar on the pipes therein had set.

Unless we are to hold that the knowledge of its representatives in charge of the work as to the manner in which the work was being done, was not the knowledge of plaintiff itself, which, of course, cannot be held, the evidence was sufficient to support the conclusion that plaintiff knew that this substantial provision as to water in the trenches was being almost constantly disregarded by its agents, and that the work being done could not be satisfactory to the engineer in charge when ultimately put to a proper test, and the failure to comply actually discovered by him. As to such a failure under such circumstances, no equitable consideration exists in favor of the contractor which will serve as the basis for an application of the doctrine as to waiver and estoppel. (See, generally, Wait on Engineering and Architectural Jurisprudence, secs. 388, 446, 467, 468.)

It should be stated in this connection that there was sufficient support in the evidence for the conclusion that the inspectors and superintendent for the city, actually supervising the doing of the work, could not, by the exercise of all reasonable care, have known of the extent to which the provision of the specifications as to keeping the trenches clear of water was violated, inasmuch as the evidence tended to show that the failure to operate the pump and the consequent flooding of the trenches, generally occurred during the night hours, when they were off duty, the result being that new work on which the mortar had not set, and which had in some cases been already partially covered with earth, was washed to such an extent as to remove the cement therefrom.

BEATTY, C. J., dissenting.—I dissent. In addition to what is said by Justice Angellotti I desire to emphasize the point that the condition of the sewer pipe when uncovered shows conclusively, that many of the joints had never been cemented on the lower half, or that the water had been allowed to rise in the trenches where they were laid before the cement had time to set. If this fact could have been known by the inspectors appointed by the city to watch the work as it progressed it must have been known by the representatives of the contractor in charge of the work. They must have known, in other words, that the contract was being violated, and that the sewer as constructed would be practically valueless

when turned over to the city. They must have known that the reports of the city's inspectors, to the effect that the work was being done according to the contract, were false and deceptive. This knowledge on the part of its agents in charge of the work, knowledge which must be imputed to the plaintiff, deprives it of any claim to the estoppel upon which it relies.

SHAW, J.,—I concur in both the foregoing dissenting opinions.

Rehearing denied.