[Civ. No. 1625.   Third Appellate District—April 12, 1917.]

ROEBLING CONSTRUCTION COMPANY (a Corporation), Respondent, v. DOE ESTATE COMPANY (a Corporation), Appellant.

BUILDING CONTRACT—COMPLIANCE WITH SPECIFICATIONS—DEFECTS IN CONSTRUCTION—RECOVERY BY CONTRACTOR.—Where in the performance of a contract for the doing of certain concrete work in connection with the construction of a building the contractor performed the work in strict compliance with the requisites of the specifications and obtained monthly certificates approving the work, he is entitled to recover the final payment notwithstanding the subsequent cracking of some of the flooring due to an improper mixture of gravel and cement and the refusal of the architect to issue his final certificate because of such defects.

ID.—RESULTS OF WORK—WHEN RISK UPON OWNER.—Where, in the erection of a building, the owner agrees to pay a certain sum for doing a certain part of the work and specifically provides the kind of materials to be used and the manner in which they are to be used, and stands by and directs and afterward approves the work, the risk of its serving the purpose intended by the owner is clearly upon him.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial.  L. T. Price, Judge presiding.

The facts are stated in the opinion of the court.

Campbell, Weaver, Shelton & Levy, for Appellant.

Frank M. Parcells, for Respondent.

CHIPMAN, P. J.—The action was brought to recover a balance of $12,039.75 alleged to be due upon the contract price for concrete work performed on the Wiley B. Allen Building in San Francisco.  The complaint sets forth *in haec verba* the contract upon which the action is based.  Among its provisions are the following:

"FIRST: The contractor agrees, within the space of fifty (50) working days from and after the date of recording of this contract to have the foundations in shape to receive the cast iron bases and side-walk beams (Balance of work in 35 working days); to furnish the necessary labor and materials, including tools, implements and appliances, required, and perform and complete in a workmanlike manner all the trench, excavating reinforced concrete foundations, reinforced basement walls, basement floor, all floor and roof slabs, penthouses, all girder and column concrete, fire-proofing, all concrete sidewalks, retaining walls, etc., and other works shown and described in and by, and in conformity with the plans, drawings and specifications for the same made by Havens & Toepke, the authorized Architect employed by the Owner, and which are signed by the parties hereto, one set of which is on file in the office of the City and County Recorder, and the other in the office of the Architect subject to inspection by parties interested.

"SECOND: Said Architect shall provide and furnish to the Contractor all details and working drawings necessary to properly delineate said plans and specifications; and the work is to be done and the materials furnished in accordance therewith under the direction and supervision and subject to the approval of said Architect, or a Superintendent selected and agreed upon by the parties hereto, within a fair and equitable

construction of the true intent and meaning of said plans and specifications. . . .

"FIFTH: The owner agrees, in consideration of the performance of this agreement by the contractor, to pay, or cause to be paid, to the Contractor, his legal representatives or assigns, the sum of Thirty-nine Thousand Five Hundred Seventy-six dollars in United States Gold Coin, at times and in the manner following, to-wit: Seventy-five per cent of the amount of labor performed and materials erected at building and as estimated according to the whole contract price and payable on the first day of each month, commencing on the first day of August, 1908, and the balance to-wit: the sum of Nine Thousand Eight Hundred and Ninety-four dollars, thirty-five days after completion and acceptance by the Architects of this contract.

"PROVIDED, that when each payment or installment shall become due, and at the final completion of the work certificates in writing shall be obtained from the said Architect, stating that the payment or installment is due or work completed, as the case may be, and the amount then due; and the said Architect shall at said time deliver said certificates under his hand to the Contractor or, in lieu of such certificates, shall deliver to the Contractor in writing, under his hand, a just and true reason for not issuing the certificates, including a statement of the defects, if any, to be remedied, to entitle the Contractor to the certificate or certificates. And in the event of the failure of the Architect to furnish and deliver said certificates or any of them, or in lieu thereof the writing aforesaid, within three days after the times aforesaid, and after demand therefor made in writing by the Contractor, the amount which may be claimed to be due by the Contractor, and stated in the said demand by him for the certificate, shall, at the expiration of said three days, become due and payable, and the Owner shall be liable and bound to pay the same on demand.

"In case the Architect delivers the writing aforesaid in lieu of the certificate, then a Compliance by the Contractor with the requirements of said writing shall entitle the Contractor to the Certificate. . . .

"THIRTEENTH: The payment of the progress-payments by the Owner shall not be construed as an absolute acceptance of the work up to the time of such payments; but the entire

work is to be subject to inspection and approval of the Architect or Superintendent at the time when it shall be claimed by the Contractor that the contract and works are completed; but the Architect or Superintendent shall exercise all reasonable diligence in the discovery and report to the Contractor, as the work progresses, of materials and labors which are not satisfactory to the Architect or Superintendent, so as to avoid unnecessary trouble and cost to the Contractor in making good defective parts. . . .

"All floor slabs in the third, fourth, fifth and sixth floors except in corridors and lavatories to be cemented over with a coat at least ¾″ thick made of equal parts of fine, sharp, clean, screened gravel to equal parts of either Golden Gate or Standard cement as selected. Said cementing to be perfectly smooth and well troweled and to be perfectly level. . . .

"Before the concrete topping is placed on concrete floor slabs throughout third, fourth, fifth and sixth floors see that all concrete work is well cleaned off (broom cleaned) then well wet and dusted with cement, all to be done before the top coat of cement is applied."

Paragraph 4 of the complaint was amended during the trial to read as follows:

"That each and every of the covenants and conditions in said agreement contained upon the part of said plaintiff to be by it kept and performed have been fully complied with, kept, and performed by it; and plaintiff further says that it did all the work in said contract mentioned, and duly performed on its part, in every respect, said work according to specifications and terms of the contract; that said work was fully performed, finished and completed by plaintiff on or about the 1st day of July, 1909. . . . That thereafter, to wit, on the 25th day of September, 1909, plaintiff demanded of defendant's architects certificates in writing for the payments, in said contract mentioned and provided to be made unto plaintiff, then remaining unpaid, but plaintiff says said architects refused to deliver to plaintiff such certificates in writing for said payments, and ever since have refused and still refuse, to deliver the same unto plaintiff.

"That of the sum of Thirty-nine thousand five hundred seventy-six dollars, the amount by said defendant agreed to be paid to plaintiff for said work, as in said contract provided, no part thereof has been paid saving and excepting the sum

of twenty-seven thousand five hundred thirty-six and twenty-five hundredths dollars, so that plaintiff says, and charges the fact to be, that a balance of twelve thousand and thirty-nine and seventy-five hundredths dollars is due, owing and unpaid therein.''

The answer set up the defense of nonperformance. A cross-complaint was also filed by defendant alleging damages: (1) Cost of linoleum laid down to minimize the damages; (2) Loss of rentals; (3) Estimated cost of completing the work required by the contract, amounting in all to $19,753.20. As the decision of the court was against the defendant upon the issue of performance it necessarily disposed of the claim for damages. Says the brief of defendant: ''If the decision thereon be upheld, the litigation will be concluded in all respects; if the court shall hold that the plaintiff did not perform, the matter will be at large and a new trial of all issues will be in order.''

The controversy involves only the work done in the construction of the top cement finish upon the third, fourth, fifth, and sixth floors of the building. The court made the following findings:

''III. As to the allegations contained in amended paragraph IV of said complaint, and the denials of said allegations contained in paragraph V of the defendant's answer herein, the court finds that plaintiff fully performed all of the covenants and conditions of said contract, and the modification thereof set forth in paragraph III as amended, upon its part to be kept and performed, and did all the work in said contract mentioned, and did fully perform on its part, in every respect, said work according to the specifications and terms of the contract; and did fully perform, finish and complete said work in compliance with all of the conditions, and in accordance with the plans and specifications, of said contract on the 1st day of July, 1909.

''As to said allegations and denials, the court further finds that the construction and installation of the top cement finish upon the third, fourth, fifth and sixth floors of the building in which the work was contracted to be done and performed was completed by plaintiff on or about the 29th day of March, 1909, in accordance with the specifications and conditions of said contract, in a good and workmanlike manner, and when completed, as aforesaid, said top cement finish was well trow-

eled, perfectly smooth and perfectly level; that on said date said top cement finish was in a wet and soft condition; well troweled, perfectly smooth and perfectly level, and thereupon plaintiff covered said top cement finish of said floors with sand, in order to facilitate the drying and hardening of said top cement finish upon said floors; that on the 5th day of May, 1909, said sand was removed, whereupon it was discovered that in the interim said top cement finish had become dry and had become hardened, and was on said date found to be cracking, checking and loosening from the slab or rough concrete upon which said top cement finish had been applied; that thereafter said top cement finish of said floors continued to crack and check and become loosened from said slab or rough concrete, and said cracking, checking and loosening increased steadily until approximately fifty per cent of said top cement finish of said floors had been cracked, checked or loosened from said slab or rough concrete; that said condition of said floors continued up to the date of the trial of this action.

"That said contract expressly provides that the architect for the owners of said building shall provide and furnish to the contractor all details and working drawings necessary to properly delineate said plans and specifications, and that the work shall be done and the materials furnished in accordance therewith, under the direction and supervision, and subject to the approval of, said architect, or a superintendent selected and agreed upon by the parties thereto; and the court here finds that the materials used by plaintiff in the construction of the top cement finish of the third, fourth, fifth and sixth floors of said building were inspected and approved by the architect for said building, or his authorized representatives; and that said materials were mixed in the proportions specified by the contract, and that the work of laying or installing the same upon said floors was all done and performed by plaintiff under the inspection, direction and supervision of said architect, or his authorized representative, and approved by him, from the commencement of the laying of said top cement finish until its completion, on or about the said 29th day of March, 1909; that the cracked, checked, and loosened condition of said top cement finish was not discovered by, or known to, either plaintiff or defendant until the sand was removed therefrom, on or about the 5th day of May, 1909;

that said condition of said top cement finish was and constituted the first intimation received by defendant as to the ultimate condition of said floors.''

Upon the matters set up in defendant's cross-complaint and the answer thereto the court made the following findings:

''As to the allegations set forth in paragraph XII of plaintiff's answer to the first count of the cross-complaint herein, the court finds that on or about the 29th day of March, 1909, the plaintiff and cross-defendant herein had fully performed and completed that portion of the work stipulated to be done by it under its said contract with said cross-complainant, comprising the cement topping of the third, fourth, fifth and sixth floors of said building, leaving the same perfectly smooth, well troweled and perfectly level, and that, in performing said work, cross-defendant fully complied with the requirements of said contract, which specified that the floor slabs on said floors should be cemented over with a coat at least ¾ of an inch thick, made of equal parts of fine, sharp, clean, screened gravel to equal parts of either Golden Gate or Standard cement, as selected; that thereafter, to wit, on or about the 5th day of May, 1909, said cement topping or surface on said floors was discovered by said cross-complainant and said cross-defendant to have cracked and checked in several places on each of said floors, whereupon and thereafter, and at various times during the months of May, June, July and August, 1909, cross-defendant removed the cracked portions of said cement topping and replaced the same with the materials and in the proportions and in the manner as required by the specifications aforesaid, each and every time leaving the cement topping so removed perfectly smooth, well troweled and perfectly level; that the checked and cracked condition of said floors was in nowise caused by any act or thing done, or any act or thing undone, by cross-defendant, or to any fault, lack of good workmanship or failure or refusal to comply with the specifications of said contract upon its part to be performed; that the cracking and checking of said cement topping upon said floors was caused by the improper mixture of gravel and cement, said gravel and cement having been mixed and laid down by plaintiff in the proportion of equal parts, being the proportion specified and required by the contract.''

Plaintiff had judgment as prayed for, from which defendant appeals, as also from the order denying its motion for a new trial.

Appellant's contentions are: "I. The findings and the evidence both establish that the plaintiff did not perform the work required by the contract in that the top cement finish on four floors of the building was cracked and loose from the rough concrete. II. The complaint and the evidence both establish that the plaintiff did not obtain the acceptance nor the certificates of the architect which under the contract were the prerequisites of payment of the money sued for, but on the contrary that the architect refused to accept the work. There is no averment, finding or suggestion of proof that the architect's decision was impelled by fraud or resulted from mistake."

It is obvious from the findings that the trial court decided that plaintiff had fully performed its contract, in respect of these floors, by constructing them, as it had agreed to do, in accordance with the plans and specifications prepared by defendant's architects and written into the contract. Defendant's position is that if a possible way was open to plaintiff by which it could have produced a good floor it was its duty to do so, failing which the consequences must fall upon plaintiff; that, in short, it guaranteed a good floor unless it was impossible to build it by following the specifications.

Plaintiff's contract was to do certain concrete work in connection with the construction of a class A steel and concrete building being erected by defendant. The portion of the work which plaintiff was to do was specifically pointed out; the materials it was to use and the proportions of the ingredients of the concrete were specifically mentioned, and the manner in which plaintiff was to apply the mixture carefully provided for. The evidence was that plaintiff performed the work in strict compliance with the requisites of the specifications and, with the exception of the floors mentioned, the result was entirely satisfactory.

It appears that in constructing these floors plaintiff laid the concrete foundation, or built what are termed the "floor slabs," but did not put on the finishing coat until a month or six weeks later, plaintiff being engaged upon other parts of the work meanwhile. Before the finishing coating was laid on the slabs, the latter were cleaned and prepared as

directed by the specifications, the top coating was made "perfectly smooth and well troweled and  perfectly level," as called for in the specifications.  The surface was then covered with sand, an approved method of protecting the cement in the process of hardening or curing, and adhering to the slabs.  Later, as found by the court, on the removal of this sand, cracks in the cement and  failure to unite with the slabs in places were disclosed.  All this work at its various stages was done under the personal inspection of the architect or his representative, and, as the court found, with his approval.  The court found that plaintiff "laid the cement topping upon the third, fourth, fifth and sixth floors of said building in a good and workmanlike manner, and did fully perform and complete the work thereof in compliance with the conditions and in accordance with the plans and specifications of the contract."  Plaintiff's attention having been called to the defective condition of the floors, it promptly expressed its willingness to remedy it and it made an attempt to do so by relaying the defective places in the top coating, in doing which it followed the requirements of the specifications for this work in every particular, but the mixture failed to unite with the slabs, the result being that about fifty per cent of the floors was in this defective condition when plaintiff completed his contract and had called for a certificate of final completion, which was refused.  There was evidence tending to show that a better result might have been obtained had plaintiff put on the top finish contemporaneously with laying the slabs; that to have "scored" the top cement finish on the concrete slabs, or to have marked the floors off into "expansive joints," would also have been in accordance with good workmanship; that the cement finish might have been flooded with water and allowed thus to dry, or cure, and less shrinkage might have followed.  These suggestions of experts were obtained upon defendant's theory that had there been any possible way to do the work which would have avoided what happened it was plaintiff's duty under the contract to adopt such way, regardless of the obligations imposed by the terms of the contract, and regardless of the duty put upon the architect in the matter of personally directing, instructing, inspecting, and supervising the work.  Scoring was not mentioned in the specifications.  The architect testified: "Q. As a matter of fact, you personally directed them to omit the

scoring? A. They asked me how I would like to have the floors scored. I said 'no,' make the floors smooth and level.'' Nothing was said in the specifications about getting the top finish on simultaneously with the fabrication of the slabs. The specifications read: " . . . Before the concrete topping is placed on concrete floor slabs throughout third, fourth, fifth and sixth floors see that all concrete work is well cleaned off (broom-cleaned) then well wet and dusted with cement; all to be done before the top coat of cement is applied.'' These directions were faithfully followed. They show clearly, however, that the laying on of the top finish contemporaneously with the construction of the slabs as the work progressed was not contemplated. The witnesses generally agreed that to have laid the top coating contemporaneously with the other work on the floors would have been the best practice, though some of them thought it impracticable and much more expensive than the course taken. Architect Toepke testified: "Q. Then in your opinion, it would make no difference whether the cement coating was laid simultaneously with the concrete slab, or some time afterwards? A. Well, I do not see that there would be but very little difference''; and this may account for the absence of any such requirement in the specifications or any directions other than therein expressed. The contract expressly provided that all work shall be done "in accordance with the plans and specifications prepared by Havens & Toepke, architects, and under their direction, supervision and control''; and "material delivered or work erected not in accordance with the plans and these specifications must be removed at the contractor's expense and replaced with other material or work satisfactory to the architects,'' but it was also provided that the architects "shall exercise all reasonable diligence in the discovery and report to the contractor, as the work progresses, of materials and labors which are not satisfactory to the architect or superintendent, so as to avoid unnecessary trouble and cost to the contractor in making good defective parts.'' The delay in putting on the top finish was known to the architects, and if it was likely to affect the work injuriously, the architects in fairness should have called attention to it. They made no objection but supervised the putting on of the top finish and approved the work. Furthermore, the work on the four floors was finished on February 26, 1909, "with the exception of an opening of a brick-

mason's hoist," estimated to cost $120, and, on March 1, 1909, a statement of the condition of the work at that time was presented to defendant, a bill made out and demand made for payment and the record shows that payment was made on the architects' certificate that this particular work of laying the top cement finish was completed with the exception of a small amount of trowel finish about the elevator opening, amounting to $120. And the court found that all the floor work, including the top finish, was completed on or about March 29, 1909, "under the direction, inspection and supervision of said architect, or his authorized representative, and approved by him, from the commencement of the laying of said top cement finish until its completion." Except as to this small bit of work, noted in the statement, the architects' certificate was in effect a certificate of the completion of the work on these four floors on March 1st. It is urged by defendant against this conclusion that the architects could not at that time (March 1, 1909) have known what subsequently developed, and hence could not have intended to certify to the completion of the work. But they knew as much as plaintiff knew, and they knew that plaintiff was doing the work, and in fact did the work precisely as it had agreed to do it and, unless it can be held that plaintiff guaranteed the work to result in a perfect floor, it seems to us that defendant ought not to be permitted now to go behind the certificate of its agents chosen by it to pass upon this very matter. We cannot say that the contract imported such guarantee. It seems to us that when the plaintiff agreed "to furnish the necessary labor and materials, including tools, implements and appliances, required, and perform and complete in a workmanlike manner . . . all floor and roof slabs . . . and other works shown and described," etc., its engagement was to do this, as the contract specifically provides, "in conformity with the plans, drawings and specifications for the same made by Havens and Toepke, the authorized architects employed by the owner . . . " and "under the direction and supervision and subject to the approval of said architects." This interpretation, we think, is, as the contract provides, "within a fair and equitable construction of the true intent and meaning of said plans and specifications." Where, in the erection of a building, the owner agrees to pay a certain sum for doing a certain part of the work, and specifically provides the kind of

materials to be used, and the manner in which they are to be used and stands by and directs and afterward approves the work, the risk of its serving the purpose intended by the owner is clearly upon him.

Appellant cites English and American cases in which the contractor was held to have guaranteed good results in the absence of an express warranty to that effect, although counsel say: "In some cases a contrary conclusion has been reached where the plans and specifications are furnished by the owner and the builder merely agrees to perform the labor and furnish the materials specified." We do not feel called upon to give particular attention to the cases cited in which we think the rule enunciated will be found to rest largely either upon the terms of the contract, or upon the character of the work to be done. The rule applicable here, we think, will be found in *Bancroft* v. *San Francisco Tool Co.*, 120 Cal. 228, [52 Pac. 496], and *Mannix* v. *Tryon*, 152 Cal. 31, [91 Pac. 983]. And the distinction made in these cases is pointed out in *Bryson* v. *McCone*, 121 Cal. 153, [53 Pac. 637], where it was held that defendant undertook not only to make the plant according to specifications, but also guaranteed that it would do certain work. In *Mannix* v. *Tryon* it was said: "He [the plaintiff] did not agree generally to plaster the dwelling, which would leave to him the selection of the materials and the method of doing the work. His agreement was to do it in a way that the owner and the original contractor had designed; according to the specifications which they had agreed on. He had no discretion in the matter. When he followed strictly those specifications, used exactly the materials they called for in the composition of the mortar and hard finish, and applied them in a workmanlike manner, he did all his contract called for. He did not contract for results, but only to do the work in a specified way." *Jones & Laughlin Steel Co.* v. *Abner Doble Co.*, 162 Cal. 497, [123 Pac. 290], is a case where it was contended that the contractor warranted that the floors of the warehouse, being constructed in part with materials furnished by plaintiff, would bear certain weights. Speaking of the defendant the court said: "The inference is that it could and would judge for itself as to the sizes of beams required. It had a competent and experienced architect in its employ. There is nothing necessarily showing that the de-

fendant was not, or did not consider itself, competent to determine the matter, or that it relied on plaintiff's advice or suggestions regarding it; or that plaintiff offered or undertook to give such advice.''

We have not referred to the evidence and the findings as to the cause of the cracking and checking of the top dressing. The court found, and there was evidence to support the finding, that it ''was caused by the improper mixture of gravel and cement, said gravel and cement having been mixed and laid down by plaintiff in the proportion of equal parts, being the proportion specified and required by the contract.'' We cannot see that it was essential to the finding of the court that plaintiff had fully performed its contract, to make a finding as to the improper proportions of sand and cement in the mixture required by the specifications, as the cause of the defects in the floors. If, as we hold, plaintiff contracted only to furnish the materials and do the work in compliance with the plans and specifications and in good and workmanlike manner, the cause of the defects would be immaterial. Whatever the materiality of the finding may be, if any, its tendency is to fix the responsibility upon defendant by whose direction this improper mixture was used.

It appeared that the last progress payment was made by defendant in pursuance of the last certificate issued by the architect, April 7, 1909. The bill, dated April 1, 1909, states on the debit side the total due under the contract at that date, less twenty-five per cent. Then follow payments as credits and dates of payment, including the March payment, leaving a balance, $836.25, for which a certificate was given. The final bill rendered is dated June 23, 1909, in like form, for the whole contract price less the credits from the beginning to the April 1st bill, inclusive, and less the twenty-five per cent reserved under the contract. During the ensuing months plaintiff endeavored to remedy the defects in the floors, keeping itself strictly within the specifications, but met with the same difficulty encountered in first laying them. On September 24, 1909, plaintiff made written demand on the architects for certificate of acceptance and final payment and, on September 27, 1909, the architects replied, stating ''that a certificate of acceptance will not be issued for the reason that the cement topping of the 3d, 4th, 5th, and 6th floors is not in compliance with the specifications, it being loose in several

places and badly cracked and will not be acceptable to owner in its present condition.''

It appeared that, beginning on September 1, 1908, and continuing monthly on the first of each succeeding month to April 1, 1909, inclusive, architects' certificates were issued and payments promptly paid thereon, and up to this time no question arose as to materials or workmanship. The top dressing of these floors was substantially completed in February, with the exception of the little work already pointed out costing $120, and this remaining work was done in March and carried into the bill of April 1st, which was paid on the architects' certificates.

Plaintiff relies and, it seems to us, with justifiable confidence, upon the case of *City Street Improvement Co.* v. *City of Marysville*, 155 Cal. 419, [23 L. R. A. (N. S.) 317, 101 Pac. 308]. It is true that in that case there was a final certificate of completion, and this is urged as one of the grounds for distinguishing the two cases. It seems to us that so far as the work in question is concerned the March certificate, while perhaps not an acceptance, was a certificate of the completion of the work in accordance with the plans and specifications, and the court found that this work had been fully performed and completed on March 29th.

The rule is well established, as stated in *Coplew* v. *Durand*, 153 Cal. 278, 279, [16 L. R. A. (N. S.) 791, 95 Pac. 38]: ''Where work is to be done to the satisfaction of a person, evidenced by a certificate to that effect, the production of such a certificate is a condition precedent to a right of action upon the contract.'' (*City Street Improvement Co.* v. *Marysville, supra; California Sugar etc. Agency* v. *Penoyar*, 167 Cal. 274, 279, [139 Pac. 671].) The court said, in *Coplew* v. *Durand, supra:* ''The case which is thus presented is one where the work has been completed to the satisfaction of the owner and architect, and the latter thereafter and without warrant refuses to issue his certificate for the final payment. The refusal under these circumstances being unreasonable, the necessity for the production of the certificate is dispensed with.''

It must not be overlooked that the only part of the work now or at any time in controversy was the top dressing of the floors. We have seen that the March certificate of completion covered this work and it was paid for on that certifi-

cate, so that it cannot be said the plaintiff was wholly without the architects' certificate. The refusal to issue the final certificate in September was based upon the claim "that the cement topping of the 3d, 4th, 5th, and 6th floors is not in compliance with the specifications." The evidence was and the court found that the work was done in conformity with the specifications in every particular, and at the time of its completion no question arose as to any feature of the work. On the contrary, it was declared by the architect Toepke to be satisfactory. The reason given for the refusal was not founded on the facts nor upon what we regard as the fair construction of the contract and can only be based upon the theory that plaintiff guaranteed a good floor, which was a matter not within the province of the architect to foreclose and make the ground of his refusal; neither is it a theory justly deducible from the provisions of the contract.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on May 12, 1917, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 11, 1917.